46 C.C.P.A. (Patents)

**Sydney ARCHER, Appellant,**

v.

**Domenick PAPA, Appellee.**

**Patent Appeal No. 6400.**

United States Court of Customs and Patent Appeals.

Feb. 11, 1959.

Rehearing Denied May 15, 1959.

Richard Whiting and Sol B. Wiczer, Washington, D. C. (Dean Laurence and Herbert I. Sherman, Washington, D. C., of counsel), for appellant.

Joseph Hirschmann, New York City, for appellee.

Before WORLEY, Acting Chief Judge, and RICH, MARTIN and JOHNSON, retired, Judges.

MARTIN, Judge.

This is an appeal from the decision of the Board of Patent Interferences awarding priority of invention of the subject matter of Interference No. 86,-729 to the senior party Domenick Papa, appellee here.

The issue of the interference is defined in the following count:

"A compound of the group consisting of acids of the formula

$$\text{I} \overset{\displaystyle \text{OH}}{\underset{\displaystyle \text{I} \qquad \text{R}}{\bigcirc}} \text{I} \quad -\text{CH}_2\text{CHCOOH}$$

wherein R is an alkyl radical of 1 to 3 carbon atoms and their non-toxic alkali metal and amine salts."

■ Papa is involved in the interference on application Serial No. 268,685, filed January 28, 1952, which date he relies upon for priority. Archer, appellant herein, relies upon application Serial No. 277,722, filed March 20, 1952. Since the applications were copending, the appellant must sustain the burden of establishing priority by a preponderance of the evidence.

Archer relies upon an asserted actual reduction to practice of the claimed compounds by July of 1950, prior to Papa's filing date. The board found that a compound embraced within the structural formula set forth was produced on Archer's behalf at the date alleged by him. Nevertheless, the board awarded priority of invention to Papa after finding Archer's proof of actual reduction to practice deficient in that Archer had " * * * failed to establish practical utility for the product * * *." Accordingly, the sole issue before us is whether Archer's disclosure by July, 1950 of the utility of the claimed compounds was sufficient to establish an actual reduction to practice of the composition.

There is no dispute concerning the pertinent facts in this case.

The compounds in issue are known as cholecystographic agents; that is, they aid in roentgenographic examination of the gall bladder.[1] These compounds concentrate in the gall bladder after being orally administered, and, since they are opaque to X-rays, opacify that organ in radiographs. Appellant's assignee is a pharmaceutical company which has the usual departments including research, manufacturing and sales. This company has marketed other cholecystographic agents used to diagnose human gall bladder ailments, including two known as "Telepaque" and "Hypaque."

Experiments to ascertain the value and toxicity of these compounds follow a fairly uniform procedure, as reflected in the record. First, certain animals such as dogs or cats are given specified amounts of the compound. In the preliminary experiments about 10 animals are used, and if some degree of success is apparent, the experiments are continued with many more animals, in order to ascertain the proper dosage. Possibly 30 or 40 test animals are given various quantities of the compound in order to establish the dosage which will produce the desired results. Toxicity is determined separately by giving various amounts of the compounds to mice. If all of these experiments prove satisfactory, clinical tests (experiments with human beings) are initiated and the compound is administered to between 300 and 500 humans in order to determine its feasibility for commercial use.

A compound coming within the scope of the interference count was prepared, isolated and analyzed by June 1950 by technicians under appellant's direction. In June and July of 1950, this compound was administered to *healthy* cats in dosages of 50 and 100 milligrams per kilogram of test animal body weight, to each of two groups of 5 cats. The results proved satisfactory in that several X-ray pictures of the cats' gall bladders were produced which were characterized by testimony as "good" or "excellent." One such picture showed certain abnormalities of this particular organ. No clinical tests were made and no further experiments were performed until the fall of 1953.

1. American Illustrated Medical Dictionary, Dorland (1944), page 321.

Upon being queried as to the reason. why the experiments were stopped in 1950, appellant's witness testified as follows:

"XQ290. Can you tell us why, under these circumstances, Win 4284 [a compound within the scope of the count] was not further tested after June, 1950 and prior to 1953, when your testing was resumed? A. The data that I had, based on a small number of cats on Win 4284, indicated that Win 4284 was as effective as Win 2011 [Telepaque], but not more effective than Win 2011.

"At that time, as I recall, we had clinical data on Win 2011 which showed that it was a very effective cholecystographic medium and there was no indication from the clinical reports that there were any serious adverse effects with Win 2011, and, if I can recall correctly the events at that time, there was no particular necessity or request from my employer that I do additional work on Win 4284 at that time, since the results at that time on Win 2011 seemed to be sufficiently encouraging that it did not seem necessary to do additional pharmacological work-up on Win 4284. I had simply noted in my own judgment that if it became necessary to do additional work, that Win 4284 would be my second choice, as far as the workup, in the event I were called upon for such information.

\* \* \* \* \* \*

"XQ306. Is that possibly the reason why further tests were not conducted with 4284? A. There are two possible reasons, and I am not certain that I can identify either of them as being the precise reason.

"The first is, that there was a limited amount of compound available and it may have been that after the 50 and 100 milligramme per kilogramme dosage levels were completed and the acute oral toxicity determination completed that there may not have been enough material to go ahead with the 25 milligramme per kilogramme dose level.

"The second is, that the collection of the data at 25 milligrammes per kilogramme of body weight may have been arbitrarily deferred to a later date in the face of the favorable data which were available at that time on Win 2011."

The reasons for resumption of the experiments were stated to be as follows:

"XQ314. Why was your interest greater in the Fall of 1953 than it was at the end of June, 1950? A. One point was the report by Doctor Papa at the A.C.S. meetings in the fall of 1952.

"XQ315. But that was a year previously? A. Secondly, the appearance of the announcement of Teridax [Papa's compound within the scope of the count], which appeared in the advertisements in the radiology journals, as I recall, in October, 1953, was a source of interest to me to study Win 4284, in an effort to establish the cholecystographic properties of Win 4284 for study in comparison with Teridax, which had then become commercially available, and also to compare the cholecystographic efficiency of Win 4284 in comparison with Telepaque."

The appellant's application discloses that

"These new compounds are useful as X-ray contrast media, and are particularly valuable as cholecystographic agents. \* \* \* The compounds of my invention have been found to be more effective in producing shadows of the gall-bladder than alpha-phenyl-beta-(4-hydroxy-3, 5-diiodophenyl) propionic acid which is currently the cholecystographic agent of choice. \* \* \* the compounds \* \* \* when administered orally to cats in a dose of 100 mg. per kg. of body weight, gave excellent shadows of the gall-

bladder in X-ray pictures. * * * No toxic manifestations in the cats were observed."

It is apparent that appellant's ultimate objective was to establish that this compound would be an effective cholecystographic agent to diagnose human gall bladder diseases; that the preliminary experiments determined only that the compound could be used to cause the gall bladder of a cat to appear as an opaque shadow on a cholecystogram; that no toxicity was observed in cats and that acute oral toxicity tests were performed on mice with satisfactory results; and that the appellant framed his application to cover only that which had been actually accomplished, without regard to his ultimate objective.

There are two issues in this case. Do tests showing a successful use of a compound, which use is only a step towards the ultimate intended use of that compound, constitute a showing of utility sufficient to establish an actual reduction to practice, when the count itself states no purpose and the specification is limited to the use disclosed in those tests? Second, does the delay, after such tests, of a year and eight months prior to filing a patent application, indicate that those tests were only abandoned experiments?

In Hedenskoog v. Backus, 48 F.2d 408, 409, 18 C.C.P.A. 1065, a pin-setting machine was constructed and successfully operated in 1920 and then dismantled and rebuilt in 1926. There, the question of reduction to practice was in issue. This court stated:

"The main contention of appellant here is that the 1920 machine, not being complete so as to properly set a full complement of pins, and later being dismantled and nothing further having been done to the machine until after appellant's application had been filed, must be looked upon as an abandoned experiment. * * *

"Appellant seems to base his right to priority mainly upon the proposition that the tests of appellee's 1920 structure showed that it was admittedly an unsatisfactory machine from a commercial standpoint.

"Agreeable to the finding of the board we conclude that, as affects the counts in this case and the issue as presented, the noisy character of the machine which rendered it commercially unsatisfactory is not a sufficient basis to justify a conclusion that the 1920 machine was not a reduction to practice. The machine was demonstrably proven to operate in setting the pins in the manner called for in the counts. The necessary details of improvement in order to make it commercially desirable are matters with which we are not concerned."

Further, this court had before it the question involving compositions of matter as effective mydriatics and antispasmodics in the case of Blicke v. Treves, 241 F.2d 718, 44 C.C.P.A. 753. Much of that opinion is pertinent to the case at bar, since the experiments were performed on rabbits, cats and dogs, whereas the compounds ultimately were to be used in the treatment of human beings. This court said in its decision on page 721 of 241 F.2d, on page 758 of 44 C.C.P.A.:

"In its decision, the board stated that 'The only field of utility here disclosed is human therapy.' In our opinion, that conclusion is not supported by the facts of record. It is apparently based on the testimony taken on behalf of Blicke which indicates an intention to use the compounds defined in the counts in human therapy if they were shown to be satisfactory for that purpose. However, the facts are that neither the Blicke application nor the Treves patents make any mention of human therapy. The application merely states that the compounds described 'are useful in the form of their water-soluble non-toxic salts as antispasmodic agents,' while each of the patents describes the compounds as 'having mydriatic activity' and as being 'further valuable

as antispasmodics.' Webster's New International Dictionary, 1949, defines 'antispasmodic' as 'having a sedative effect on the nervous system; preventing or allaying spasms or convulsions.' The same authority defines 'mydriatic' as 'causing dilation of the pupil.' Neither definition is limited in terms to therapy or to effects on human beings as distinguished from other animals.

\* \* \* \* \* \*

"We are of the opinion that the record amply establishes tests by or on behalf of Blicke prior to either of the record dates to which Treves is restricted. Those tests were of such a nature as to prove that the compounds in issue had a definite antispasmodic effect upon animals and were not seriously toxic, and we conclude those tests are sufficient to establish a reduction to practice of the invention in issue. It is, accordingly, unnecessary to consider whether the tests were sufficient to show that the compounds had utility in human therapy."

With reference to the delay of almost three years in filing the application after the experiments were performed, this court said:

"\* \* \* While it is true that a long delay in applying for a patent after allegedly successful tests have been made is a factor to be considered in evaluating the tests, it is by no means conclusive. Hedenskoog v. Backus, 48 F.2d 408, 18 C.C.P.A. 1065. It is to be noted that Blicke's application was filed before either of the patents to Treves was issued. There is nothing in the record to show that the filing of the application was inspired by knowledge of another's activity, as was the case in Mason v. Hepburn, 13 App.D.C. 86, cited by appellant. In the instant case the evidence that Blicke's tests on animals were successful is sufficiently clear to rebut any presumption of

failure which might arise from his delay in filing of his application."

▮▮ These cases clearly indicate that the inventor's ultimate purpose need not be achieved in order to establish utility required for a reduction to practice. For, as this court found in Blicke v. Treves, supra, "\* \* \* where an interference count does not specify any particular use, evidence proving substantial utility for any purpose is sufficient to establish reduction to practice."

Here, Archer had isolated a species of the compounds claimed and had completed experiments indicating its function as an opacifying agent to facilitate roentgenographic examination of cats' gall bladders. The evidence shows, in fact, that the experiments were successful in producing good to excellent X-ray pictures.

Furthermore, we do not consider that the twenty month delay in filing Archer's application shows that the earlier tests were abandoned experiments. Rather, Archer's attention was diverted to "Win 2011" which had alerady been proven clinically successful, thereby eliminating the necessity for an immediate "\* \* \* pharmacological workup on Win 4284." There is no evidence that appellant's application was inspired by the work of others, since this record fails to show that the application was filed with knowledge of any of Papa's activities relating to "Teridax." As in Blicke v. Treves, supra, the evidence of Archer's production of satisfactory X-ray pictures of cats' gall bladders is "\* \* \* sufficiently clear to rebut any presumption of failure which might arise from his delay in filing of his application."

We accordingly find that the tests in 1950 established utility, and hence that the subject matter of the count was actually reduced to practice at that date by the appellant Archer.

However, Papa relies upon the board's statement that

"\* \* \* the reduction to practice must have been appreciated by the inventor at the time it was made.

See Interference Law and Practice (Rivise and Caesar), Volume 1, pp. 484–488; Jacobs et al. v. Buxton, 553 O.G. 178; 30 C.C.P.A. 987, 135 F.2d 237, 57 U.S.P.Q. 302; Electro-Metallurgical Co. v. Krupp Nirosta Co. [D.C.], 45 U.S.P.Q. 541, 33 Fed. Supp.) 324 (affirmed [3 Cir., 122 F. 2d 314] 50 U.S.P.Q. 158)."

Those authorities are deemed inapposite herein. The cases cited involve situations in which parties asserting they had made a prior reduction to practice did not know the identity of substances used in useful processes or compositions of matter, and could not duplicate their production at the date of the alleged reductions to practice.

■■ In view of the above, we are of the opinion that the appellant, Archer, has sustained the burden of showing that he reduced to practice the invention in issue by July, 1950, prior to the filing date of the appellee, Papa.

■ Subsequent to the filing of the record in this court, appellee filed a motion suggesting correction of a diminution of the record by adding certain testimony and exhibits of both parties. That motion was granted subject, however, to the order of the court taxing the additional costs of printing incurred thereby on final decision. We find that the additional matter certified to the court was reasonably necessary to a proper determination of the issues in the case. Accordingly, the costs of printing same will be taxed against the appellant.

The decision of the Board of Patent Interferences is reversed, and priority of invention of the contested count is awarded to Archer.

Reversed.