47 CCPA

**Application of John A. NELSON and Anthony C. Shabica.**

**Patent Appeal No. 6338.**

United States Court of Customs and Patent Appeals.

June 14, 1960.

Worley, Chief Judge, and Kirkpatrick, Judge, dissented.

174

A. Ponack, Wenderoth, Lind & Po-
nack, Washington, D. C. (Harry Gold-
smith of counsel), for appellant.

Clarence W. Moore, Washington, D. C.
(Joseph Schimmel, Washington, D. C.,
of counsel), for the Commissioner of Pat-
ents.

American Patent Law Association,
William H. Webb, Washington, D. C.,
John D. Upham, John H. Schneider, John
R. Janes, John T. Kelton, New York City,
Harvey W. Edelblute, Stamford, Conn.,
Leland L. Chapman, Cleveland, Ohio, The
Connecticut Patent Law Association,
James Edwin Archer, Robert Ames Nor-
ton, John E. Hanrahan, Stamford, Conn.,
amicus curiae.

Before WORLEY, Chief Judge, and
RICH, MARTIN, and SMITH, Judges,
and Judge WILLIAM H. KIRK-
PATRICK.* [Original argument before
JOHNSON, Chief Judge, and
O'CONNELL, WORLEY, RICH, and
JACKSON (retired), Judges.]

RICH, Judge.

This appeal is from the decision of the
Patent Office Board of Appeals affirming
the rejection of all claims of appellants'
application for patent, serial No. 259,-
014, filed November 29, 1951, on "14-
Hydroxy Androstenes."

The original opinions in this case were
handed down on June 24, 1958. The
court's decision reversed the rejection of
the claims. After extensions of time
granted on motion and stipulations, the
Patent Office filed a Petition for Rehear-
ing on August 25, 1958 and appellants'
objections thereto were filed September
29, 1958. We granted the petition on
April 17, 1959. Appellants and the Pat-
ent Office filed additional briefs on Octo-
ber 19 and 20, 1959. Amicus curiae
briefs were received during September
from the American Patent Law Associa-
tion and the Connecticut Patent Law As-
sociation and the Philadelphia Patent
Law Association filed a "Statement" say-
ing that it approved and adopted the po-
sition taken by the American Patent Law
Association in its amicus brief. All

* United States Senior Judge for the Eastern
District of Pennsylvania, designated to
participate *in place of Judge O'CON-*

*NELL*, pursuant to provisions of Sec-
tion 294(d), Title 28 United States Code.

amici supported appellants' position and urged us to adhere to our decision. Reargument was heard November 2, 1959, counsel for appellants, the American and Connecticut associations, and the Patent Office participating.

In accordance with our usual practice, our former opinions have been withheld from formal publication. They are hereby withdrawn. The following is the opinion of the court. While we have revised our first opinion our former decisions are unchanged.

## Introduction

The legal issue in this case has evinced the changeability of a chameleon, exhibiting sometimes subtle and sometimes complete changes of color. In introducing the subject we can, however, say with complete certainty that the ultimate question is whether the disclosure of appellants' application is sufficient to support a patent. There is no rejection on prior art, no question of novelty or unobviousness or that the invention is in a category of subject matter on which patents can be granted. Utility seems to be involved but the precise Patent Office position on this point is still obscure.

Appellants have disclosed a group of novel compounds and how to make them. They have also said certain things about what can be done with them and how to do it. Appellants and the amici contend that this disclosure is sufficient to support a patent and the Patent Office says it is not. Who is right depends on what the specification says either about the *utility* of the invention or *how to use* the novel compounds, or both, and what the law is on these matters.

The law, at least in its statutory form, can be most simply stated. In Title 35 of the United States Code, section 101 reads, in pertinent part, as follows:

"Whoever invents or discovers any new and useful * * * composition of matter * * * may obtain a patent therefor, subject to the conditions and requirements of this title."

This limits the grant of patents to "useful" inventions and this is the "utility" requirement of the statute. We must also consider section 112 which says [emphasis ours]:

"The specification shall contain a written description of the invention, and of the manner and process of making *and using* it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make *and use* the same, and shall set forth the best mode *contemplated by the inventor* or carrying out *his invention*."

In section 112 there are the "how to use" and the "best mode" requirements about which much of the argument in this case revolves.

## The Disclosure

The claims on appeal are directed to new steroid compounds, claims 1 and 10 being typical and reading:

"1. A C–19 14 $\alpha$-hydroxy-androstene wherein the double bond is attached to the carbon atom 5.

"10. 14$\alpha$-hydroxy-4-androstene-3, 17-dione."

Claim 10 was copied by appellants from Murray et al. patent No. 2,662,089 (issued on an application filed after appellants filed) in order to provoke an interference. Appellants' specification contained, when filed, the following statements about the use of the claimed compounds [emphasis ours]:

"The cardiac glycosides, such as digitoxigenin and the like, comprise steroids which contain an OH-group in the 14-position. Important physiological properties are attributed to these steroids. *However, synthetically produced C–19 14-hydroxy-androstenes wherein the double bond is attached to carbon atom 5 have not heretofore been known.*

"*A primary object of the present invention is the embodiment of such synthetically-produced compounds,*

corresponding to formula I supra.[1] *These new compounds are valuable intermediates in the preparation of steroids* wherein a hydroxyl group is present in the 14-position, and of steroids containing a 14,15-double bond, and of steroids the synthesis of which requires such groupings.

\* \* \* \* \* \*

"Conversion of the androstene compounds to produce analogous saturated 14-hydroxy steroids is effected by hydrogenating the ▲5-double bond, for example by catalytic methods."

The specification also teaches that the acyloxy groups in the 3- and 11- positions of appellants' compounds can be hydrolyzed to the corresponding 3-hydroxy groups and the latter oxidized to keto groups to produce the corresponding ketone compounds. It also teaches how the 17-keto group can be reduced to a hydroxyl group with the aid of an agent such as catalytic hydrogen, sodium borohydride, lithium aluminum hydride and the like, following these statements with illustrative reaction schemes setting forth the conversions by means of graphic formulae.

#### The Rejection

The board described the rejection thus: "Claims 1 through 7 and 10 have been rejected as *lacking utility*." [Emphasis ours.] This is the rejection it affirmed. The examiner's final rejection of July 26, 1954, which the board had under review, said [emphasis ours]:

"Claims 1 to 7 and 10 are finally rejected *for lack of utility* for the reasons fully explained in the last Office letter. \* \* \*

" \* \* \* in view of the *fatally defective* nature of the present *application*, applicants are not entitled to a patent \* \* \*."

■ The examiner's Answer, on the appeal to the board, after stating again

that the claims were under rejection "as lacking in utility," also said, *inter alia*,

"The applicants fail to show how these intermediates can be converted to products having known *useful* properties. *The mere allegation that they are useful for conversion is not sufficient.* \* \* \* there is no justification for assuming that a conversion product of the claimed compound will be *useful*. \* \* \* the disclosure is fatally defective with respect to [the] *utility requirement of 35 USC [§] 112* \* \* \*." [Emphasis ours.]

Since the board affirmed the examiner's rejection, that, of course, is the ground of rejection which is before us for consideration. In re Scharwath, 164 F.2d 609, 35 CCPA 763.

The essence of the board's reasoning in affirming the foregoing rejection is contained in the following excerpts from its first opinion:

"There is no assertion in appellants' specification that they are able to synthesize an *active* digitalis glycoside from their intermediate, nor any other specific *physiological active* steroid having a hydroxyl group in the 14-position or with a 14,15-double bond. [Emphasis ours.]

\* \* \* \* \* \*

" \* \* \* there is no evidence before us that \* \* \* appellants ever produced a *useful* steroid from their \* \* \* intermediates. [Emphasis ours.]

\* \* \* \* \* \*

"35 U.S.C. [§] 112 requires an applicant to fully describe how to make and *use* the invention and to set forth the best mode contemplated of carrying it out. Clearly appellants have failed to do that in this case because they have not shown how their intermediate may be used to prepare a single useful steroid. We are unable to conclude that a method for doing this would be ob-

---

1. Formula "I" is the general structural formula of the claimed androstenes set forth in the specification.

vious to one skilled in the art. [Board's emphasis.]

\*　\*　\*　\*　\*　\*

"*There are of course cases where no utility need be disclosed because it is either obvious or well known.* However an incomplete disclosure, in a case (as herein) where *utility* is necessary to a full disclosure of the invention, is no better than one totally lacking it because both *fail to comply with 35 U.S.C.* [§] *112.*" [Emphasis ours.]

The board, as did the examiner, cited the 1950 decision of this court in In re Bremner et al., 182 F.2d 216, 37 CCPA 1032 and seemed to regard that case as the controlling authority supporting its point of view. We shall point out later why the Bremner case fails to support the rejection.

### The Issue

It will be seen from the foregoing that the rejection was variously predicated on lack of utility, failure to show utility, failure to allege sufficient utility, failure to comply with the "utility requirement of 35 USC [§] 112" and failure to disclose how to use the claimed compounds. Out of this congeries of explanations as to why the specification was allegedly "fatally defective" the Patent Office solicitor distilled the statement in his original appeal brief that

"\* \* \* it is clear that *what is meant is* that the claims are based upon a specification which fails to contain a written description of the *manner of using* the invention, as required by Section 112 of Title 35 U.S.C." [Emphasis ours.]

That is clear, standing by itself, but the brief then proceeds to argue that the real defect was that "applicants fail to show how these intermediates can be converted to products having known useful properties," for which reason they were not shown by the disclosure to *be useful.* It argues that it is on the *utility* of the compounds into which appellants' compounds were to be converted that the case hinges "since a compound which acts as an intermediate for the produc-

tion of another compound *having no utility* can hardly be said to *be useful* in the sense of the law." [Emphasis ours.] Thus does the brief inextricably tie up the question of disclosure of how to use under section 112 with the issue of utility under section 101.

The Patent Office petition for rehearing charged us with an extrajudicial excursion, in our original opinion, into the meaning, and bearing on the issues, of section 101 and with rendering an advisory opinion thereon which we should withdraw. We considered section 101 because we were of the opinion—after an intensive, not to say frustrating, effort to determine on what ground the claims were rejected—that the examiner's rejections and the board's reasoning involved a scrambling of the separate statutory requirements that an invention must be useful to be patentable, and that an application, to comply with the law, must adequately teach those skilled in the art how to make and use the invention. We are still of that opinion and we therefore as requested in the Connecticut amicus brief, retain in our opinion an expression of our views as to the bearing on the issues of both sections 101 and 112. As the American amicus brief points out, the Patent Office has taken the position that appellants have not complied with section 112, but it has not shown why this is so except by objection to the *kind* of utility disclosed, which presents an issue under section 101 rather than under section 112.

In its brief on the rehearing the Patent Office again stated the issue to be solely whether the requirements of section 112 have been complied with, but its interpretation of this issue in the brief as a whole and in oral argument is that section 112 has not been complied with because the specification does not show that a *patentable* invention has been *made* for the reason that the invention *described* is *not useful* under section 101, or at least that such use as is disclosed is insufficient under section 101. Mention of section 101 has been avoided but this construction is inescapable.

The issue here cannot, therefore, be restricted to a consideration of the disclosure of how to use, under section 112, and necessarily requires a consideration of the requirement of section 101 that an invention, to be patentable, must be "useful." Section 112, as we view the matter, does not deal with "utility," in the sense in which that term is used in patent law to define a prerequisite to patentability.

### Utility

The grand objective of the patent system, as stated in the Constitution, is to promote the progress of the *useful* arts. Presumably for this reason, our patent statutes, from the very beginning in 1790 to the latest act of 1952, have made it a prerequisite to patentability that the invention be new *and useful*. However, it has never been a requirement for patentability that there must be any particular degree of utility. To cite a very early text, Curtis On Patents (1849) says, in section 16,

"The word 'useful' is not supposed to be used, for the purpose of establishing general utility as the test of a sufficiency of invention to support a patent. It had been held, upon the use of the same word in the old patent act of 1793, that it *was used merely in contradistinction to what is frivolous or mischievous* to society. This term was held to be satisfied, if the alleged invention was *capable* of use, and was *not injurious* to the well-being, good policy or sound morals of society. [Cases cited: Lowell v. Lewis, [Fed. Cas.No.8,568]. 1 Mas. 186; Bedford v. Hunt, [Fed.Cas.No.1,217] Ibid. 303; Knease [Kneass] v. Schuylkill Bank, [Fed.Cas.No.7,-875] 4 Wash.[C.C.] 9, 12.]" [Emphasis ours.]

Again in section 28, after repeating the substance of the above, he says,

" * * * it follows that every invention, for which a patent is claimed, must be, to a certain extent, beneficial to the community; it must be capable of use, for *some* beneficial purpose; but when this is the case, *the degree of utility, whether larger or smaller, is not a subject for consideration, in determining whether the invention will support a patent.* But it is obvious that the capability of use for some beneficial purpose is a material element in determining whether there is a sufficiency of invention to support a patent; the force of the word 'useful,' introduced into the statute in connection with the epithet 'new,' being to determine whether the subject-matter, upon the whole, is *capable of use,* for a purpose from which *any advantage* can be derived to the public. General rules will not decide this question in particular cases, but the circumstances of each case must be carefully examined, under the light of the principles on which general rules are founded." [Emphasis ours.]

See also Curtis on Patents, 4th Ed., (1873) § 106, page 111, enlarging on this theme.

Looking at an even earlier text, written contemporaneously with the patent act of 1836, The Law of Patents For Inventions by Phillips (1837) in Chapt. VII, Subjects of Patents, Sec. 14, Usefulness (10 pages), the following, quoting a classic statement of Mr. Justice Story,[2] appears (p. 139):

"All that the law requires is, that the invention should not be frivolous,

2. In his preface, Phillips, after referring to Chief Justice Marshall and some other judges, says: "But it is no injustice to the other eminent jurists of the country to say, that this department of the law has been more especially indebted to the learning and talents of Mr. Justice Story, the records of whose indefatigable research and luminous expositions, will be found in many parts of this volume." Mr. Justice Story was on the U. S. Supreme Court 1811–45 and was also professor of law at Harvard 1829–45. He was the author of a famous series of Commentaries.

or injurious to the well-being, good policy, or sound morals of society. The word *useful,* therefore is incorporated into the act in contradistinction to mischievous, or immoral. For instance, a new invention to poison people, or to promote debauchery, or to facilitate private assassination, is not a patentable invention. But if the invention steers wide of these objections, whether it be more or less useful is a circumstance very material to the interest of the patentee, but of no importance to the public. If it be not extensively useful it will silently sink into contempt and disregard. (From Lowell v. Lewis, 1 Mason 182.) [Fed.Cas.No.8568]"

This passage was quoted with approval by the Circuit Court of Appeals, Third Circuit, in 1947 in Cusano v. Kotler, 159 F.2d 159.

Again at page 142, with footnote references to texts and cases, the above author, Phillips, says:

"The requisite of usefulness has been sometimes contrasted with frivolousness, and the multiplicity of patents for trivial subjects has been occasionally deprecated by judges. An invention may be slight and trivial as being so obvious and apparent that it cannot be considered a discovery, or it may be trivial or frivolous in respect to its effect upon industry and production. A defect in the first sense renders the patent void as being for a subject that is not an invention. But an invention of a very slender character in the latter sense is still the subject of a patent, since *it is not the province of the court to go into the question of the extent or degree of usefulness.* It is enough that the invention is useful; *how useful it may be is immaterial.*" [Emphasis ours.]

▮ In H. C. Merwin's text, Patentability of Inventions (1883), p. 75 the author states:

"As to the term 'useful', the courts have construed the condition expressed by it so liberally that it almost never serves to defeat a patent. The following rules are clearly established: 1. *Anything is useful which is not entirely frivolous or worthless, and not detrimental to the well-being, or injurious to the morality of the public, or of a character to mislead the public to its disadvantage.* 2. The subject of a patent need not be the best or most useful of its kind. It is necessary only that it should be useful in some degree. 3. It need not possess all the usefulness, or the degree of usefulness, claimed for it in the patent. 4. In a suit for infringement, if the defendants are proved to use the invention described in the patent sued on, they are estopped to deny its utility." [Emphasis ours.]

The classic text, Robinson on Patents (1890), says:

§ *341. Degree of Utility Immaterial.*

"When actual utility exists, its degree is unimportant. However slight the advantage which the public have received from the inventor, it offers a sufficient reason for his compensation; and as he could withhold this slight advantage if he chose, his surrender of it to the public places him on the same plane of merit with every other inventor. *Nor is it necessary that this advantage,* whether great or small, *should flow directly from his art or instrument, considered by itself.* For though it is a mere improvement upon pre-existing arts or instruments, or is incapable of serving any purpose except as an integral part or element of some different invention, or embodies an idea or means whose highest value can be realized only by advancing it to a more perfect state of development, it still has an inherent usefulness which satisfies this requirement of the law." [Emphasis ours.]

In a somewhat later text published at the turn of the century, Walker on Patents (5th Ed., 1904), the chapter on "Utility" occupies but six and a half pages (pp. 97–103). The concepts set forth are simple. "To possess utility, a thing or a process must be capable of producing a result, and that result must be a good result." "Utility is absent from all processes and devices which cannot be used to perform their specified functions, and patents for such subjects are therefore void." "Whatever is beautiful is useful, because beauty gives pleasure, and pleasure is a kind of happiness, and happiness is a kind of utility." Hence, a thing having *no function except to decorate* is useful, Magic Ruffle Co. v. Douglas, 1863, Fed.Cas.No.8,948, 2 Fish.Pat.Cas. 330. On the contrary, "Utility is negatived if the function performed by an invention is injurious to the morals, the health, or the good order of society." "A patent is *prima facie* evidence of utility * * *."

Rogers on Patents (1914), Vol. 1, page 9, says:

> " * * * utility in its broadest sense approaches a presumption more nearly than any other point recited in the statute and is seldom questioned by the courts or the Patent Office, except in cases of perpetual motion, or in such cases, for example, as a spark arrester which works so vigorously as to stop the locomotive, or some visionary, obviously impracticable, scheme."

As a subsequently arising example of the last mentioned type of invention one might cite the decision of this court in In re Oberweger, 115 F.2d 826, 828, 28 CCPA 749, wherein an invention consisting of various admixtures of such things as bone marrow, aromatic oils and alcohol was held lacking in utility for the specified purpose of growing hair. The court referred to the fact that the "concoction * * * belongs to a class of compositions which from common knowledge has long been the subject matter of much humbuggery and fraud." See also

In re Perrigo, 48 F.2d 965, 18 CCPA 1323.

In National Slug Rejectors, Inc. v. A. B. T. Mfg. Corporation, 7 Cir., 164 F.2d 333, 335, Judge Evans said, "It is not the extent of the utility that governs, but the existence of *some* utility," citing 40 Amer.Jurisprudence, "Patents," Sec. 43, p. 546. Quite recently, citing a number of authorities, the District Court for the Southern District of New York held that "Absent proof of total incapacity the defense of non-operativeness or non-utility is not available." Technical Tape Corp. v. Minnesota Mining & Mfg. Co., 143 F.Supp. 429, 438.

Now let us consider whether applicants' new compounds, the claimed C–19 14-hydroxy-androstenes, are "useful" by the legal standards discussed above, according to the information which is given to us in the specification. We are told thereby that these are new androstenes, of a kind never before made (and novelty has not been questioned), that they are of a type which steroid chemists can use in well-known reactions to produce steroids of a class at least some members of which are known to have useful therapeutic properties. Appellants' point is that new "building blocks" *of value to the researcher* have been supplied which have *utility as intermediates* in the search for cheaper and shorter routes to the synthesis of steroids having therapeutic or similar ultimate utility.

The Patent Office position seems to have been that there must be a presently existing "practical" usefulness to some undefined class of persons. We have never received a clear answer to the question "Useful to whom and for what?" Surely a new group of steroid intermediates is *useful to chemists doing research* on steriods, and in a "practical" sense too. Such intermediates are "useful" under section 101. They are often actually placed on the market before much, if anything, is known as to what they are "good" for, other than experimentation and the making of other

compounds in the important field of research. Refusal to protect them at this stage would inhibit their wide dissemination, together with the knowledge of them which a patent disclosure conveys, which disclosure the potential protection encourages. This would tend to retard rather than promote progress.

The new androstenes, being *useful to research chemists* for the purposes disclosed by appellants, are clearly useful to society and their invention contributes to the progress of an art which is of great potential usefulness to mankind. They are new steroids which in known ways can be made into other steroids, thus furthering the development of this useful art.

We conclude that the claimed compounds are "useful" within the meaning of section 101 and that there is a disclosure of the utility in the specification. We turn now to the question of whether the disclosure of "the manner * * * of * * * using" is sufficient to comply with section 112.

### Requirements of Specification

▪ Of equal antiquity with the utility requirement of the statute is that for a specification which, as provided by section 2 of the act of 1790, 1 Stat. 110, was required to be of such particularity as would "enable a workman or other person skilled in the art * * * to make, construct, or use" the invention. No real alteration has been made in this law through the years or in the fundamental reasons for requiring such a specification, which are two. Quoting again from Phillips, The Law of Patents (p. 233):

"There are two objects in view in making a specification. As the law grants the patentee a monopoly, and not only awards damages, but inflicts a penalty for violation of the exclusive privilege, it very equitably requires that the invention shall be so described in the specification, that every person may, by examining it, *know what the patentee claims*, and be able to distinguish what may be an infringement. The other object of the specification is to *give the public the advantage of the invention* after the expiration of the patent. The consideration of the patent being the advantage to be derived to the public after its expiration, it is necessary, in order that this advantage may be realized, that the invention shall so be described in the specification, that *one acquainted with the art* or manufacture, to which it relates, or with which it is most nearly connected, may not only understand the invention, but be able, by following the directions given in the specification, with the assistance of the drawings, to construct the machine or perform the process *which is the subject of the patent*. These two objects of the specification are the foundation of the rules and decisions in regard to it." [Emphasis ours.]

Reading the first paragraph of section 112 of the Patent Act of 1952, quoted at the beginning of this opinion, will show that in more than a century nothing of substance has been changed in this portion of the statute. We add to Phillips' explanation of its purpose, however, that a further public advantage from the specification is the addition it makes to technical literature immediately upon issuance of the patent, without waiting for its expiration.

The board said that "clearly" appellants have not complied with the requirement that they "fully describe how to make and *use* the invention and * * * set forth the best mode contemplated of carrying it out." It is not so clear to us that appellants have failed to comply.

▪ The descriptions in patents are not addressed to the public generally, to lawyers or to judges, but, as section 112 says, to those skilled in the art to which the invention pertains or with which it is most nearly connected. The sufficiency of a specification must be tested in the light of this fact and judged by what it conveys to those who *are* skilled in the art. The judge's task is to decide.

whether from the disclosure the man skilled in the art can make the invention and use it. If he can, this part of the statute is complied with, subject to the one further requirement that the inventor describe the best mode contemplated by him of carrying out his invention.

Let us now examine what appellants have disclosed in their specification about their new compounds and how to use them. First, they have fully described their compounds and *how to make* them. No question has been raised as to this. Secondly, as to the "best mode * * * of carrying out" their invention, their *invention* is the new compounds, not something to be done with them. The only apparent way in which it can be "carried out," it seems to us, is to make the compounds and no question has been raised but that the best way known to the appellants of doing this has been disclosed. Finally, we come to the description of how to use the invention, i. e. the C–19 14-OH-androstenes claimed. Appellants have said to those skilled in the art: Use them as intermediates to make other steroids having analogous structures; you can do this by hydrogenating the delta-5 double bonds by catalytic methods which you already know about. Similarly, with respect to other reactions, to which we referred above, other hydrolysis and oxidation procedures were suggested and we have no doubt that those skilled in the steroid art would know of many other reactions in which they could use these intermediates in the course of their research. Are appellants entitled to a patent on this disclosure? We think they are. We are unable to see any fatal defect with respect to the disclosure of *how to use* the invention.

The Patent Office brief argues that granting this patent would not be a carrying out of the constitutional objective of promoting progress of the useful arts. With this contention we wholly disagree. How does the patent system function to promote progress? It is not like a system of military awards in which medals are given out by the people to their heroes as expressions of gratitude for their *exceptional* services. While the element of reward is one factor in the patent system, it is probably the least important. The patent system is an incentive system calculated to do two things, principally. First, it stimulates work, research, development, invention, and discovery by holding out the prospect of profit. Second, in exchange for and as a condition of the patent protection, it secures a full *disclosure of the invention*. Promotion of the useful arts takes place through the combination of these two factors, the doing of the work *and the disclosure of the results* thereof. In the very nature of things, progress is made as the result of both the big and the little contributions, mostly the latter. We get a telephone or a triode—in modern jargon a "major scientific breakthrough" —only at rare intervals. The seemingly little advances are the bread and butter of progress and sometimes turn out to be of much greater importance than at first thought. The biggest contribution the patent system makes to progress is to induce a steady flow of contributions and to secure their continuous disclosure.

As a corollary, there is the matter of private publication of the results of research which in turn fertilizes and assists further research. Accepting, arguendo, the statement in appellants' brief that a description of their invention was published some years ago in the belief that their patent application was legally adequate (and it was, by prior standards of the Patent Office), clearly self-interest would have dictated a withholding of that publication if the board's decision is correct; for a satisfactory application would have had to await the day when some use of the new androstenes other than that disclosed had been discovered. The disclosure of these new compounds and how to make them would not have been made, either by publication or patent application. They would have been kept secret and would not have become part of the stream of progress. We think an affirmance of the rejection here would

tend to defeat the constitutional objective.

What the Patent Office is really trying to insist on here has nothing to do with the "how to use" provision of section 112. It is demanding some different, or greater, or more commercial or more mundane use than the one disclosed. Just what kind of use, we have been unable to discover although it is apparent that the Patent Office would have been satisfied if the new compounds, or other steroids made therefrom, had possessed *therapeutic* activity.

Essentially the reason given by the board for its decision affirming the rejection seems to be that appellants have not shown the production from their new androstenes of a single *physiologically active* steroid. While the board itself has rendered some decisions tending to support its view that this is necessary,[3] notably Ex parte Tolkmith, 102 USPQ 464 (1954), and an unpublished decision discussed in the article it cited entitled "The Utility Requirement in Chemical Patent Applications," 38 J.P.O.S. 282 (1956), the only higher authority cited which is in point is the opinion of this court in the Bremner case, supra.

The Bremner Case and What a Specification Must Say About Utility and How to Use

The Bremner case, 182 F.2d 216, 217, 37 CCPA 1032, decided by this court in 1950, sustained a rejection on the ground that the specification failed to comply with R.S. 4888 (35 U.S.C., 1946 ed., 33, the predecessor statute to 35 U.S.C. § 112). While eschewing any "hard and fast" rule on disclosure of "utility" in a specification, the court said it felt certain that the law required *"an assertion of utility and an indication of the use or uses intended."* The case has been cited as authority for this proposition ever since.[4] The board and the examiner have relied on it to support the rejection in the present case.

It is clear to us that the above "rule" of the Bremner case has been fully met in appellants' application. They have *asserted* that their new steroid compounds are useful and they have *indicated* that the intended use is in the field of steroid chemistry wherein they have utility as intermediates in synthesizing other steroid compounds. Nothing in the Bremner case requires more. The Bremner case requires that the specification must "indicate" the use or uses of the invention intended by the applicant. The court held that the Bremner et al. application, in spite of its disclosure of "resins" and melting points, contained nothing indicating a use, and the rejection was sustained. Now, it was strenuously argued that anyone skilled in the art would know what to do with the "resins" disclosed, that all new chemical compounds have obvious utility as intermediates, citing Ex parte Watt, 63 USPQ 163, 165, and a Lewers article, 4 J.P.O.S. 530, 542, and hence *utility* may be assumed as to all new compounds. The court's answer was that the applicants' specification *has to indicate the intended use or uses,* which is a requirement distinct from the mere *possession* of "utility."

---

3. The board has also entertained a contrary view in a situation having marked similarities to the present case but where the new compounds were remote from the pharmaceutical field. See Ex parte Ladd et al., 112 USP2 337, wherein a rejection on the ground the claims were "lacking in utility" was reversed by the board.

4. The first law point discussed in the Bremner opinion was that a patent specification is required by law to assert "utility" and the factual finding was that it did not. We find on review of the record that the court was mistaken in saying there was no assertion of utility, for the opening statement of the Bremner et al. specification was that the invention was "new *and useful.*" Upon reflection, we are now of the opinion that a *mere assertion* of utility in a specification is a meaningless formality and no more required by law than an assertion of novelty. We think it only reasonable to infer from the fact of filing an application that the applicant asserts that the invention is new and useful, for unless it is both he has no right to a patent. 35 U.S.C. § 101.

We are not disposed to alter this requirement, which has now been the case law for a decade. We do believe, however, that its rationale needs elucidation.

Much confused thinking on this matter has resulted from a failure to separate the requirement of section 101 that an invention *be* useful from the section 112 requirement that a specification shall so explain "the manner and process of * * using" the invention as to "enable any person skilled in the art * * * to * * * use the same." Possibly the difficulty of applying the language of section 112 to diverse fact situations contributes to the confusion, for that language is not tailored to fit all of the kinds of inventions which may be patented under sections 100 and 101. For example, one cannot "make" a process and neither is it clear that "manner and process of * * * using" is apt with respect to a new "composition of matter." [5] Moreover, section 112, being the generalized provision that it is, leaves it to the Patent Office and the courts to make the final decision on whether the explanation of manner and process of use does in fact enable one skilled in the art to "make and use" the invention.

If we assume, arguendo, as was in fact argued by Bremner in his case, that all chemical compounds are inherently useful and so have the "utility" required by section 101, we are still left with the problem of compliance with section 112, which is not directed to the *existence* of usefulness but to what an inventor must disclose as the quid pro quo for patent protection.

▉ The basic purpose of the requirement that the specification contain a written description of the invention is to put those skilled in the art in possession of sufficient knowledge "to enable" them to practice the invention. One cannot read the wording of section 112 without appreciating that strong language has been used for the purpose of compelling complete disclosure. There always exists, on the part of some people, a selfish desire to obtain patent protection without making a full disclosure, which the law, in the public interest, must guard against. Hence section 112 calls for description in "full, clear, concise, and exact terms" and the "best mode" requirement does not permit an inventor to disclose only what he knows to be his second-best embodiment, retaining the best for himself.

▉ In keeping with the policy and spirit of this law, the rule of the Bremner case requires, as a minimum, that the inventor "indicate" a use for a new composition. As above stated, Nelson and Shabica did this, the use being as an intermediate in research on a specific class of steroids. In adhering to the Bremner rule we wish to make it clear, however, that the test is what the application as a whole *communicates* to one skilled in the art. In some cases an applicant may, merely by naming his new instrument or material, indicate *what* its use is, as, for example, by saying he has invented a "match," "hammer," "paint," "adhesive," or "detergent." He *may or may* not have to go further in order to *enable* others to use the invention, depending on its nature and on how much those of ordinary skill in the art know. In other words, compliance with the law does not necessarily require specific *recitations* of use but may be inherent in description or may result from disclosure of a sufficient number of properties to make a use obvious; and where those of ordi-

5. Text writers have glossed over the difficulties of applying this law to fact situations, as for example in Walker on Patents, Deller ed., Sec. 163, referring to R.S. 4888:
 "The detailed description of the invention must be full enough, and clear enough, and concise enough, and exact enough, to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make and use the invention, if it is a machine or a manufacture, *or to compound the invention, if it is a composition of matter*, or to perform the invention, if it is a process." [Emphasis ours.]
 This was almost exactly the same in Walker's first edition, sec. 115.

nary skill in the art will know *how* to use, the applicant has a right to rely on such knowledge. If it will not be sufficient to enable them to use his invention, he must supply the know-how. As this court has often said before, each case must be judged on its own facts.

We believe our decision in this case to be consistent with the opposite result reached in the Bremner case because of the differences in the facts. Bremner disclosed eight polymers of dihydropyran and, since he said nothing whatever about use, he left it to the art to guess what to do with them on the basis of what he told about their properties. He said his solid polymers were "resins," a word which, to a chemist, is broad enough to include a wide variety of diverse materials and which has no definite meaning. One of his products was a golden, highly viscous liquid soluble in benzene and the others were solids melting at temperatures from 60°C. to above 200°C. One was said to be "hard" and one was described as "colorless." *No other properties than these were disclosed.*

The description of a liquid as golden, highly viscous and soluble in benzene is as applicable to engine oil and varnish as it is to Bremner's liquid polymer. Bremner argued as to his solid products that they were inherently *useful* since any "resin" which is solid at room temperature and melts at a higher temperature can be molded by melting it and pouring it in a mold to solidify. But this amounted to no more than saying one can change the shape of the material, and applies to all thermoplastic materials including butter, roofing tar and candlewax. It no more indicates or suggests a use than stating that big pieces of the material can be cut up into little pieces. Eventually, but too late, Bremner submitted an affidavit showing a use which could not possibly have been guessed from his disclosure, namely that "the polymers are useful as ingredients of polyvinyl chloride compositions," more specifically as plasticizers.

Contrasting the disclosure of Bremner with that of the instant application, Bremner was completely silent as to what his polymers could be used for and did not disclose enough as to their properties to enable one even to make an intelligent guess as to a use. Bremner was the first to make polymers of dihydropyran. No one knew anything about them. Nelson and Shabica, on the other hand, were not silent. They included in their application an explicit statement that their compounds were for use in making specific steroids having certain structures, related to the structures of their own compounds, which they disclosed. They told what procedures could be used in using their compounds. Not only did they "indicate" a use, they explained it in detail and told how to carry it out in practice.

What has beclouded the issue in the present case is the *nature* of appellants' use, which the Patent Office erroneously regarded as not meeting the statutory requirements on "utility." With that issue out of the way, it is clear that they taught how to use their new compounds.

In holding, as we do, that appellants complied with section 112 in making a clear disclosure of use in steroid research, we do not mean to imply that applicants for patents on new compounds can now rest on an assumption that they are useful as intermediates and obtain patents without even suggesting *what* use may be made of them or *how* that use may be effected. We are not holding that *all* compounds are inherently useful as "intermediates." We have reason to believe some are not, and it is a question of fact to be determined in each case. Assuming, however, that a given compound would be so useful, it would still be incumbent on the applicant to disclose what is to be made from it and how it would be done. What the Bremner rule requires is that an application shall make known to those skilled in the art something that can be done with a new compound and not, through silence, leave the matter entirely to speculation or independent investigation.

## The Petrocarbon Case

The Patent Office urges upon us as an authoritative precedent the case of Petrocarbon Limited v. Watson, 101 U.S. App.D.C. 214, 247 F.2d 800, decided July 3, 1957, by the Court of Appeals, District of Columbia. The decision was by a divided court, Judge Burger dissenting with an opinion.

■ While we recognize the special competence of that court to deal with questions of patent law and accord substantial weight to its views as an appellate court of equal standing, we regretfully find ourselves in complete disagreement with the majority view on the question of patent law involved. While it is entitled to deference, it is not authoritatively binding on us. See Watson v. Allen, 103 U.S.App.D.C. 5, 254 F.2d 342. Since it involves a question of law on which that court as well as ours is frequently required to pass, we set forth with particularity our reasons for disagreement.

The Petrocarbon case, like the present case, involved the question whether a specification was fatally defective for failure to comply with section 112. The specification described new polymers, asserted to be useful, which deposited from vapors on cool surfaces in the form of a "film." The film was described as having great thermal stability up to 270°C., was said not to be attacked by sulfuric acid at 150°C., and to be insoluble in, and not to swell visibly in, boiling solvents. Seven solvents of various types were named. The case turned on the meaning of the term "film" which was said to be well understood by those skilled in the art, though the court chose to find great ambiguity in it. The majority of the Court of Appeals sustained the District Court's refusal to receive expert testimony and exhibits to show what "film" actually meant to those skilled in the art. This evidence, it seems to us, would have assisted the court in determining the fundamental issue of what the disclosure actually was. We agree with Judge Burger's dissent on the ground that the evidence should have been received. Even without it, however, our own reading of the specification leads us to the conclusion that anyone skilled in the plastics art, knowing all of the chemical and physical properties given for the film, would know of many possible uses for the polymers and how to use them. The case differs from the Bremner case in the amount of information given about the new polymers which, in the Petrocarbon case, was sufficient to enable those skilled in the art to use the new materials and hence section 112 was complied with.

For the reasons above stated, we must respectfully decline to accept the Petrocarbon case as a precedent.

The Patent Office also relies on In re Perrigo, supra [48 F.2d 966], one of the few cases in this court on the subject of utility. The passage cited says,

> "Neither the Patent Office tribunals nor the courts may properly grant patents upon a mere possibility that a device might do the things claimed for it and be useful."

That statement has no applicability to the facts at bar because it was made in the context of an alleged invention, the description of which the court characterized as "not comprehensible," either to it or to the tribunals of the Patent Office. The court had before it a device which was clearly *incapable of being used for anything* and was dealing with the rejection that it was "lacking in utility as a result of *inoperativeness.*" [Emphasis ours.] The above quotation continues,

> "Neither the Constitution nor the statutes contemplate the granting of patents upon theories, nor giving a monopoly upon intellectual speculations embodied in devices incapable of scientific analysis."

We are entirely in accord with that statement, but a specification fully describing how to make a group of new chemical compounds of a class containing highly useful members, what their structure is, what type of compounds they can be used to make, and how to go about doing

so is far outside anything under consideration in the Perrigo case.

### Reduction to Practice Cases

The Patent Office petition for rehearing asserted that our decision herein was inconsistent with a number of prior decisions in inter partes cases as to the proof of utility required to establish an actual reduction to practice. The cited cases in this court are: Muskat et al. v. Schmelkes, 140 F.2d 984, 31 CCPA 837; Saklatwalla v. Marburg, 172 F.2d 227, 36 CCPA 791; Kvalnes v. Wright, 183 F.2d 193, 37 CCPA 1147; Morway et al. v. Bondi, 203 F.2d 742, 40 CCPA 917; Reiners v. Mehltretter, 236 F.2d 418, 43 CCPA 1019; and Blicke v. Treves, 241 F.2d 718, 44 CCPA 753. Also cited were decisions of the Court of Appeals, D. C., in Knutson et al. v. Gallsworthy et al., 82 U.S.App.D.C. 304, 164 F.2d 497; and Larsen v. Marzall, 90 U.S.App.D.C. 260, 195 F.2d 200. We have carefully considered these cases and also Archer v. Papa, 265 F.2d 954, 46 CCPA 835; Kyrides v. Bruson, 102 F.2d 416, 26 CCPA 986; and Larson et al. v. Eicher, 49 F.2d 1029, 18 CCPA 1497, which were not cited but which are as pertinent, though less favorable to the Patent Office position.

 We see no conflict or inconsistency as between our present decision and the decisions in those inter partes cases. All we are concerned with here is whether an application contains sufficient disclosure to comply with the law. In every interference it has already been determined, before the interference is declared, that the application of each party is in compliance with law. Insofar as this decision has an effect on the requirements of application disclosures, it will apply equally in inter partes and ex parte cases, as does all of the law on the subject; an application sufficient for one purpose is sufficient for all purposes, including the establishing of a constructive reduction to practice. It would not be proper in this ex parte case to make any pronouncement as to what is required by way of test to establish an *actual* reduction to practice in an inter

partes case but it can be stated that so far as utility is concerned, there is but one standard to be applied, regardless of where or how the issue is raised. As to tests to establish utility, which may mean operativeness or suitability for an asserted use, an examination of the above cited cases will show that the requirements may vary all the way from no test at all to testing under actual service conditions. See Morway et al. v. Bondi, supra. Inter partes priority disputes involve policy considerations with which we are not concerned in an ex parte case and we cannot prejudge what will be required in future situations. All we say now is that the application before us adequately complies with the law.

The Patent Office point predicated on the above inter partes cases and strongly argued in the petition for rehearing appears to have been abandoned by failure to mention it in the solicitor's rehearing brief. We have dealt with it, however, to make clear the fact that we have not overlooked it.

### New Matter

One final point remains for disposal. During prosecution, in an effort to answer the examiner's contention that the specification contained an inadequate disclosure of utility, appellants attempted to add a paragraph about which they stated in their "Remarks,"

> "In the amendment filed December 10, 1952 it was pointed out how by known methods applicants' compounds may be converted to known useful compounds shown in the Ruzicka et al patent. These well-known and obvious steps have been incorporated in the specification."

The examiner rejected the amendment as new matter only as to its last sentence but the board held the entire paragraph to be new matter.

 Of course, if the application had been fatally defective, as alleged by the examiner, such a defect could not have been cured by an amendment the object of which was to put into the specification something required to be there when it

was filed. The new matter rejection by the board on that theory was sound. However, we are reversing the finding that the specification was fatally defective.

 We have considered the paragraph sought to be entered to augment the original disclosure of utility. It seems to us that it clearly goes beyond what is permitted by 35 U.S.C. § 132 and Patent Office Rule 118, 35 U.S.C.Appendix, which provides that "an addition to the original disclosure, cannot be added to the application." The amendment appears to us to be an addition to the disclosure and the refusal to admit it will, therefore, be affirmed.

For the above-stated reasons, the decision of the board is reversed as to the rejection of claims but affirmed as to the admission of the amendment objected to as new matter.

Modified.

MARTIN, Judge (concurring in part).

With but a single exception I am in complete accord with the extremely well considered majority opinion. My sole disagreemnt lies with the application of the section 112 requirement, as construed by the majority, to the facts of the Bremner case.

Although it is not clear from the face of this court's opinion in the Bremner case, the ground of rejection there appealed from was appellants' alleged failure to comply with R.S. 4888,[1] the predecessor to section 112. R.S. 4888 read:

"Before any inventor or discoverer shall receive a patent for his invention or discovery, he shall make application therefor, in writing, to the Commissioner of Patents, and shall file in the Patent Office a written description of the same, and of the manner and process of making,

constructing, compounding, and *using* it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound, and use the same; * * *." [Emphasis added.]

In construing the requirements of R.S. 4888, with respect to how much must be said about the uses of chemical compounds in a specification wherein they are claimed, this court in the Bremner case stated that there must be *"an indication of the use or uses intended."* This interpretation has been carried forward by the majority as its view of the section 112 requirement, while making clear the fact that no specific mode of communicating that information is requisite as long as the specification as filed contains it.

The Bremner specification, in my opinion, completely satisfies the applicable statutory standard in that the disclosure gives one skilled in the art "an indication of the use or uses intended" by Bremner and his co-applicants. As filed, it stated:

"The [dihydropyran] polymers vary from viscous liquids to hard brittle solids, according to the operating conditions, such as the temperature of polymerization, polymerization catalyst and duration of polymerization. In general the longer the period of polymerization, the higher the melting point of the polymer.

"As a further feature of the present invention we have found that polymers of higher molecular weight, as indicated by higher melting point, can be obtained if the polymers, produced as hereinbefore described, are heated at tempera-

---

1. The Examiner's Statement in the Bremner appeal asserted that "The present specification fails to meet the requirements of either Section 4888 R.S. or Rule 35 of the Rules of Practice because nowhere in the specification is there a statement of what the products can be used for." The board summarized the examiner's position thusly, "From the description, the Examiner concludes that no *practical* use of the compounds is disclosed, as required by Sec. 4888, Rev. Stats., and Rule 35 (Rules of Practice)." [Emphasis added.]

tures above 100°C., preferably between 100°C. and 200°C., in the presence of the Friede-Crafts type catalysts hereinbefore defined.

"The quantity of catalyst present during the heating step may vary within wide limits, but it is desirable to use a quantity of catalyst smaller than that used during the polymerization step, for example a quantity about one tenth of that used in the polymerization step has been found suitable. It is desirable therefore, at the conclusion of the polymerization step to remove or destroy the catalyst present, for example by washing the polymer with boiling water, or by adding ammonia to the polymer, and subsequently to add catalyst, which may be different from that used in the initial polymerization step, in a quantity less than that used in the said polymerization step."

With respect to the products formed as a result of the processes outlined in the examples, the disclosure reads:

"The product was a golden coloured, highly viscous liquid, * *. [Example 1.]

"The solid mass was dried and powdered giving a yield of about 80% of a hard resinous polymer. [Example 2.]

"The precipitated solid was separated and dried by heating at 180°C. for a time just sufficient to drive off the solvent to give an almost colourless resin having a melting point of 84.5°C. [Example 3.]

"On pouring the product into boiling water and working up the emulsion produced, a resin having a melting point [of] 95°C. was obtained. [Example 4.]

"On pouring the product into boiling water and working up the emulsion produced, a resin having a melting point of 60°C. was obtained. [Example 5.]

"The precipitated solid [from the initial polymerization] was separated and dissolved in benzene, washed with water and the benzene evaporated off. A sample of this polymer, after heating at a temperature of 180°C., for a time just sufficient to drive off final traces of the benzene, had a melting point of 91°C. Following this, 0.05% by weight of boron trifluoride hydrate was added to the remaining polymer which was then divided into two parts: the parts were heated at temperatures of 120°C. and 180°C., respectively, after which the melting points of both portions were found to be higher than 200°C."

In one of their responses to an Office Action rejecting the claims because the specification did not comply with R.S. 4888, appellants argued:

"No person skilled in the art, having applicants' disclosure before him, could fail to appreciate the utility of applicants' products. For example, the product of Example 2 is described as a hard resinous polymer and *it is apparent that such polymers may be used to form various shaped objects or as a coating composition.* Likewise, it is apparent that the products described by applicants may be used to modify known resinous polymers. These and many other uses will be obvious to one skilled in the art in view of applicants' disclosure." [Emphasis added.]

In another amendment applicants stated:

" * * * it would appear obvious that a new synthetic resin, such as produced by the applicants, is obviously of some utility."

In accordance with the view the majority espouses with respect to the requirements of section 112 I feel that appellants were correct in the Bremner case, and that the information given in the specification, from which I have quoted extensively above, was sufficient to inform one skilled in the art of the areas in which the claimed polymers might ultimately have some practical utility.

No more than that is required under the principles set forth in the majority opinion. Therefore, although I agree with the rule announced in the Bremner case and brought forward in connection with section 112 in the instant appeal, I disagree with the application of that rule to the facts of the Bremner case and would overrule the ultimate conclusion there reached.

WORLEY, Chief Judge (dissenting).

Although the present majority opinion is a substantial improvement over that handed down when this appeal was first heard, I regret that I am still unable to reconcile my views of the standards of patentability with those expressed by the majority.

The majority says "The grand objective of the patent system, as stated in the Constitution, is to promote the progress of the *useful* arts." If that reference is to Article I of Section 8, then I respectfully suggest it is too loose a paraphrase of such a basic and controlling force in our patent system. The Constitution actually says: *"The Congress shall have Power * * * To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."* I agree that section embodies the "grand objective" of the patent system, but am unable to agree that appellants have here attained that objective, nor have they satisfied the specific statutory implementation thereof, as Judge Kirkpatrick so well points out in his dissenting opinion.

Patent rights are valuable rights and should be earned by those who seek patent monopolies. But the net effect of granting a patent here will be to give appellants an unearned monopoly on a substantial area in the field of chemistry, and prevent others, unless they are willing to risk infringement, from also experimenting in a field which should remain open to all.

It would also seem that another result of the majority view will be to encourage research workers to file patent applications prematurely on all new compounds they might develop, but to penalize those who seek to first ascertain patentable uses for new compounds before filing applications.

Although, when this appeal was first heard, I was not convinced appellants had clearly established their right to a patent, I was erroneously inclined to resolve the doubt in their favor. However, if the majority opinion serves as a precedent, it seems inevitable that in the future the public will be exchanging fixed patent rights for a diminishing *quid pro quo* far below the standards contemplated by the Constitution and the statutes.

I would affirm.

KIRKPATRICK, Judge (dissenting).

With the greatest respect for the views of the majority of the court, I am unable to agree. It seems to me beyond question that the result of the court's decision and opinion is to write the requirements of the Patent Statute, that inventions must be useful, out of the law. Section 101 allows a patent to an inventor only if he has discovered a *useful* process, machine, manufacture or composition of matter. Apparently unwilling to accept a mere statement in the application that the subject matter is useful, Congress added Section 112 which, in effect, requires the inventor to tell in his specification exactly how to make use of the invention.

Now, every composition of matter whether new or old, that we so far have knowledge of, can be changed or modified physically or chemically. Congress certainly meant more by "useful" in the statute than mere capability of being changed into something different. It is hardly reasonable to think of Congress as setting up, as a special requirement for patentability, a quality inherent in every composition of matter which can be invented or described.

The application presently before us is for a chemical compound. Beyond the mere fact that it can be changed, all that

is disclosed, so far as utility is concerned, is that if changed by certain well understood chemical procedures, it will produce a different chemical compound (or different compounds) belonging to the steroid group—compounds having generally similar molecular structures. Some members of this group are known to have beneficial therapeutic effects. Others have no such effect, or at least none known to science. There is nothing in the entire specification to show what any steroid which can be derived from the compound of the application will do or how to manufacture a steroid which will have any therapeutic value, or, for that matter, any value of any kind.

Admittedly, no great degree of usefulness is necessary for a valid patent, but every definition of "useful," including the ones cited by the majority, requires at least *some* degree of utility. The first sentence of the excerpt from Justice Story's charge to the jury, quoted by the majority, if taken by itself, may give a different impression, but it will be seen from the latter part of the excerpt that what was meant was that if an invention "steers wide" of frivolousness or danger to society, it is unimportant whether it is "more or less" useful. Judge Goodrich's remark in Cusano v. Kotler, 3 Cir., 159 F.2d 159, 162, to the effect that "A study of the cases reveals that the legal significance of 'useful' in the patent statute differs from the general conversational connotation of the word" is nothing more than a statement of the fact that a game (the patent under consideration was for a game) may be regarded as useful under the patent statute although many people consider time spent in playing games as time wasted. I cannot believe that either text writers or courts ever thought that the word "useful" in the statute meant simply "harmless."

The burden is upon the applicant for a patent to show that his invention has all the requirements of the statute, including usefulness. At the very least, even by Justice Story's standard, he must show that it is neither frivolous nor injurious to the "well-being * * * of society." I do not suppose that this applicant's product is injurious to the well-being of society but for all that he tells us in his specification it could be, and, though it may well be that he has spent time and labor in a sincere effort to create something which would be a benefit, one could call the result frivolous despite its impressive formula if it should turn out to have no use of any kind.

The requirements of Section 112 as to showing manner of using are inseparable from those of Section 101 as to usefulness. The provision of Section 112 that the specification shall describe the manner of using a process or composition of matter (unless it is obvious) certainly means, in view of Section 101, that the applicant must show how his invention can be employed usefully. The present application discloses how the new composition of matter may be made, but the disclosure of the manner of using it amounts to an instruction to experiment with it in the hope (which the applicant does not even pretend is a probability) that something else can be made from it which can be employed usefully.

Describing the compound of this application as a "building block" has a certain persuasiveness, but could not the product of any uncompleted research be so described, since others, beginning where the inventor left off, can carry on the work, perhaps to a successful conclusion? What stands out clearly from this record is that the search for a useful therapeutic compound has stopped short of achievement and that the applicant has left the result of his unfulfilled efforts to successors for experimentation to see whether anything useful may come of it.

This court, in the case of In re Bremner et al., 182 F.2d 216, 217, 37 CCPA 1032, said "we feel certain that *the law requires that there be in the application an assertion of utility and an indication of the use or uses intended.*" I do not think the Bremner case can be successfully distinguished from the present one. The case turned on the point that, while a new chemical compound could be produced by the processes disclosed by the

appellants, the products claimed to be so developed were not patentable because no use for them had been shown in the specification. Bremner's resins were just as useful for further experimentation by persons skilled in the art as the present applicant's androstene compounds.

Concededly, the decision of the Court of Appeals for the District of Columbia Circuit in Petrocarbon Limited v. Watson, 101 U.S.App.D.C. 214, 247 F.2d 800, in which the application was held insufficient for failure to disclose what use could be made of the product, is on all fours with the case now before the court.

This application fails to show that the composition of matter which it proposes to patent is useful, and I think that the decision of the Patent Board of Appeals rejecting all its claims should be affirmed. I agree with the majority as to the affirmance of the board's refusal to admit the proposed amendment to appellant's specification, and would affirm the decision appealed from in its entirety.