**Application of Arnold N. JOHNSON.**
**Patent Appeal No. 6579.**

United States Court of Customs
and Patent Appeals.
July 20, 1960.

Rehearing Denied Oct. 10, 1960.

Laurence & Laurence, Herbert I. Sherman, Washington, D. C. (Dean Laurence, Washington, D. C., of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (Joseph Schimmel, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Judges, and Judge WILLIAM H. KIRKPATRICK.*

SMITH, Judge.

This appeal is from the decision of the Board of Appeals of the United States Patent Office affirming the rejection by the Primary Examiner of claim 1 of appellant's application No. 518,340 filed June 27, 1955 for a patent on a condensation product of hexachlorocyclopentadiene. The appealed claim is as follows:

"1. The dimer of hexachlorocyclopentadiene having the formula

* United States Senior District Judge for the Eastern District of Pennsylvania designated to participate *in place of*

*Judge O'CONNELL*, pursuant to provisions of Section 294(d), Title 28 United States Code.

$C_{10}Cl_{12}$ and having a melting range of 483 degrees to 487 degrees centigrade."

The reference relied on is

Prins, "Rec. des. trav. Chim. des Pays-Bas," Vol. 65, pages 455–67 (1946).

The reference discloses the claimed dimer of hexachlorocyclopentadiene and, since it was published more than one year prior to the filing date of the instant application, it is a statutory bar under 35 U.S.C. § 102(b) unless appellant is entitled under 35 U.S.C. § 120 to rely upon the filing date of his earlier application No. 757,321, filed June 26, 1947 on which patent No. 2,724,730 was granted November 22, 1956. The earlier application was copending with the appealed application and was filed less than a year after the date of the reference.

The issue here is whether appellant is entitled to rely upon 35 U.S.C. § 120 to secure for the present application the benefit of the filing date of the earlier application. The resolution of this issue requires us to determine whether the invention here claimed was disclosed in the earlier application "in the manner provided by the first paragraph of section 112" of 35 U.S.C.

The examiner and the board have held that the earlier application did not disclose the invention here claimed as required by section 120 and stated that the earlier application contained no disclosure of utility for the product here claimed. Appellant asserts that any person skilled in the art to which the claimed invention pertains would be able, with the teachings of the earlier application before him, to use the product 1) as chemical intermediates for organic synthesis, 2) for solvent uses and 3) for the preparation of toxic substances such as "insecticides, fungicides, etc."

No issue has been raised concerning appellant's identification of the claimed compound and disclosure of a method of making it in the earlier application. It is the position of the examiner and the board that the utility of the compound was not sufficiently disclosed therein. The earlier application contains the following assertion of utility:

"The products of the aforesaid process are valuable as chemical intermediates for organic synthesis, for solvent uses and for the preparation of toxic substances such as insecticides, fungicides, etc."

■ While the examiner and the board both stated that the earlier application did not contain a sufficient statement of the utility of the product here claimed, we find the paragraph just quoted to be sufficient for that purpose. Solvents, intermediates, insecticides and fungicides are products having utility. This meets the utility requirement of 35 U.S.C. § 101. The question remains, however, whether the description of the manner and process of using the compound for these purposes as set forth in the earlier application is sufficient to meet the requirements of the first paragraph of 35 U.S.C. § 112.

We have had occasion to consider the requirements of section 112 at some length and to discuss them in our recent opinion in In re Nelson and Shabica, 280 F.2d 172, 47 CCPA ——. We there stated:

"The basic purpose of the requirement that the specification contain a written description of the invention is to put those skilled in the art in possession of sufficient knowledge 'to enable' them to practice the invention. One cannot read the wording of section 112 without appreciating that strong language has been used for the purpose of compelling complete disclosure."

The test for sufficiency of compliance with section 112 as stated in the Nelson and Shabica decision is "what the application as a whole *communicates* to one skilled in the art." In elaborating on that test we said:

" * * * In some cases an applicant may, merely by naming his new instrument or material, indicate *what* its use is, as, for example, by

saying he has invented a 'match,' 'hammer,' 'paint,' 'adhesive,' or 'detergent.' He may or may not have to go further in order to *enable* others to use the invention, depending on its nature and on how much those of ordinary skill in the art know. In other words, compliance with the law does not necessarily require specific *recitations* of use but may be inherent in description or may result from disclosure of a sufficient number of properties to make a use obvious; and where those of ordinary skill in the art will know *how* to use, the applicant has a right to rely on such knowledge. If it will not be sufficient to enable them to use his invention, he must supply the knowhow. * * *"

■■ It is well settled that an applicant need not expressly set forth in his specification matters which are commonly understood by persons skilled in the art. Webster Loom Co. v. Higgins et al., 105 U.S. 580, 586, 26 L.Ed. 1177; In re Chilowsky, 229 F.2d 457, 43 CCPA 775. As was said in the former case:

"That which is common and well known is as if it were written out in the patent and delineated in the drawings."

Accordingly, if a person of ordinary skill in the art to which the claimed dimer of hexachlorocyclopentadiene relates would understand how the compounds of appellant's prior application can be used as intermediates, solvents, insecticides or fungicides, the disclosure is sufficient. We therefore do not agree in this case with the board's statement:

"Whether the utility is inherent or not is not the question. The same

must be discovered or determined for the completion of an invention."

The issue here is an issue involving adequacy of the disclosures of end uses of the claimed product when tested by the first paragraph of section 112. The reference therein to "any person skilled in the art" requires that we read and interpret the specific disclosures of utility against the background of knowledge possessed by such a person including the knowledge of any inherent utility of the claimed product.

The earlier application discloses utility of the claimed dimer as an intermediate for organic synthesis [1] and for solvent uses in addition to its use in the preparation of toxic substances such as insecticides and fungicides. The decision of the board rested on its findings of inadequacy of the disclosures of utility of the claimed dimer as an insecticide and fungicide. As to these two uses, the board, in finding the disclosure of utility insufficient, said:

"The art of formulating insecticidal compositions may be a wellknown art but there must be a determination or discovery for which insects or fungi the substances are effective. The mere formulation is insufficient."

We do not think this is a correct interpretation of the requirements of section 112. We think the earlier application contains a sufficient disclosure to one skilled in these arts when it states the compounds disclosed may be used to prepare toxic substances "such as insecticides, fungicides, etc."

The terms "insecticides" and "fungicides" are terms of general knowledge and application in this art. A person having the ordinary skills in the art

---

1. In Reiners v. Mehltretter, 236 F.2d 418, 43 CCPA 1019, this court found utility of a product where the only use alleged was that it could be used as an intermediate in producing other materials which were directly useful. In this connection, the opinion states:

"But in order to establish utility of a product it is not necessary to show that

it can immediately and without change perform a useful function. Products are useful if they serve as starting materials or intermediates in producing other materials or articles which are directly useful." (236 F.2d at page 421, 43 CCPA at page 1025.)

would be presumed to know the meaning of these terms as defined in Hackh's Chemical Dictionary (3rd Ed. 1944) as follows:

> "*Insecticide.* An agent used to destroy insects, by dusting or spraying on plants.
>
> "*Fungicide.* An agent that destroys spores and fungi; as Bordeaux mixture, arsenicals, etc."

. Such a person also would be presumed to know the conventional uses of insecticides as described in the Encyclopedia of Chemical Technology, Interscience Publishers Inc. (1951), as follows:

> "Insecticides may be applied as dusts, sprays, fumigants, aerosols, and internal applications. When applied as dusts, the toxicants are in the dry state, and usually in a finely divided form. Frequently the active ingredient is diluted with a material like clay, talc, lime, and pyrophyllite. The actual application of a dust to the area to be treated may be accomplished by sifting from a perforated container or by means of an air blast."

He also would be presumed to know what the same Encyclopedia says of fungicides:

> "The word 'fungicide' comes from the Latin *fungus,* and the Latin *caedo,* to kill, hence, a fungus killer. In practice the term has come to denote a wider concept. A fungicide is a chemical that will kill, inhibit, or inactivate a fungus so that it does not grow. * * * In general, the term carries a practical connotation, that is, a chemical that prevents fungi or molds from ravaging cloth, wood, plants, animals, and humans, or whatever else they attack."

The compounds are described in appellant's earlier application as solids and, it seems to us, therefore, that it would be well within the expected knowledge of those skilled in this art to use the toxic properties of the claimed dimers in these fields. If used as dust, the product may be diluted as desired, with an inert material.

It is true the application does not recite the concentration to be used, nor the particular kinds of insects or fungi to be treated. In our opinion these are matters which could be expected to be within the knowledge of a person of ordinary skill in this art. A reasonable compliance with section 112 does not require that the earlier application here set forth a catalog of the specific insects and specific fungi against which the dimer is effective. It is sufficient if the product is disclosed as having toxic properties and if one skilled in this art is informed, as was done here, that the product is useful as an insecticide and fungicide. The details of its use, such as the selection of suitable strengths of the toxic materials to be used against specific insects or specific fungi seem to us to be expected skills of this art.

It is to be noted that appellant's later application, which has been accepted by the Patent Office as containing a sufficient disclosure of utility and method of using the claimed compounds, merely adds to what is disclosed in the earlier case a single example stating that the toxic ingredient, in the form of a dust, may be mixed with three times its weight of an inert carrier such as talc, that this mixture when applied to the confused flour beetle (*tribolium confusium*) produced a 75 per cent knockdown and that the dust is equally effective against other species of insects, not specified.

This example does not seem to us to add any material information to what might well be considered as being within the common knowledge of any person skilled in this art. On the basis of the earlier disclosure, we think such a person would have no difficulty in preparing and using an effective insecticide or fungicide on the basis of that disclosure. Thus, we hold that appellant's earlier application sufficiently complies with the first paragraph of section 112 in that regard. It follows, therefore, that under section 120, the later application should

have been accorded the benefit of the filing date of the earlier one, and that the reference relied on is not a statutory bar to the grant of a patent on the later application.

The brief on behalf of the Commissioner of Patents in support of the board's holding has cited our decision in In re Bremner, et al., 182 F.2d 216, 37 CCPA 1032, and the decision of the Court of Appeals of the District of Columbia in Petrocarbon Ltd. v. Watson, 101 U.S.App.D.C. 214, 247 F.2d 800. For the reasons more fully discussed in our opinion in the Nelson and Shabica case, we here hold specifically that the earlier application meets the requirements of the Bremner case and decline to accept the ruling in the Petrocarbon case as a correct interpretation of the legal requirements of 35 U.S.C. § 112.

The decision of the Board of Appeals is reversed.

Reversed.

KIRKPATRICK, Judge, with whom WORLEY, Chief Judge, joins (dissenting).

I am unable to agree with the majority.

In order to get the benefit of the filing date of the parent application, appellant had to show that the invention here claimed was disclosed in the earlier application "in the manner provided by the first paragraph of section 112" of 35 U.S.C. The parent patent, which issued five months after the present application was filed, was for a process, and the present application is for one of the products obtainable by that process. It is not disputed that the specification of

the parent patent disclosed the product of the present application,[1] but the question is whether the disclosure complied with the requirements of Section 112.

The sole [2] disclosure of the parent patent which has any bearing upon utility or manner of using is found in the second paragraph of the specification and reads: "The products of the aforesaid process are valuable as chemical intermediates for organic synthesis, for solvent uses and for the preparation of toxic substances such as insecticides, fungicides, etc."

The examiner held that this disclosure falls short of complying with the requirements of 112 as to manner of using in that it does not specify the nature of the organic synthesis for which the claimed product is an intermediate, does not teach what the material is a solvent for, and does not disclose how insecticides or fungicides may be prepared therefrom. The board, confining its discussion to the disclosure relating to insecticides and fungicides, broadly sustained the examiner and quoted his grounds as to all three uses.

The majority of this court puts its decision substantially upon the grounds which were adopted in the recent decision of this court in In re Nelson and Shabica, 280 F.2d 172, 47 CCPA ——. I was unable to agree with that decision but, be that as it may, the case for the present application is far weaker than that presented in the Nelson case.

In Nelson the application disclosed not only that the claimed product was valuable as an intermediate for organic synthesis but, as stated in that opinion, the specification told what could be produced

---

1. I am, therefore, assuming that the applicant is attempting to patent here a product disclosed in the specification of the parent patent. However, it should be noted that the three examples given in that patent having the empirical formula of the present product *sublime* above 240° C., whereas the product described in the claim of the present application does not begin to *melt* until a temperature of 483° C. is reached.

2. Example IV, set forth in the specification, discloses a process for obtaining a product which, if chlorinated, will "yield valuable toxic products." It will be seen, however, that neither the reaction product which is to be chlorinated nor any of the products produced by the chlorination will be the product of the present application. For this reason Example IV cannot be relied upon to bolster up the general disclosure of utility quoted above.

by the use of the claimed compounds, namely, "that they are of a type which steroid chemists can use in well-known reactions to produce steroids of a class at least some members of which are known to have useful therapeutic properties." Although I think that disclosure was insufficient in that it fails to point to any useful steroid which could be obtained, it is far more specific than the present one which gives not the slightest hint of what is to be synthesized or what reactions may be employed to accomplish the unrevealed synthesis or what sort of composition of matter can be obtained. Nelson at least pointed out the field in which the compounds could be used and suggested reactions. Here there is nothing.

As to the suggested use as a solvent, the product claimed in the present application is a solid which melts at almost five times the temperature of boiling water. There is no clue given in the parent patent as to how a solvent of this kind is to be used or what it will dissolve. The word "solvent" alone is so all-inclusive that it teaches nothing. It might serve as an adequate disclosure for the alkahest but not for any solvent known to modern research workers.

"One cannot read the wording of section 112 without appreciating that strong language has been used for the purpose of compelling complete disclosure." (From the recent opinion of this court in In re Nelson and Shabica, supra, quoted by the majority in the present case.) How can it be said that the paragraph of the application quoted contains a complete disclosure, either of the utility of the product disclosed or of the manner of using it in such "full, clear, concise and exact terms" as Section 112 calls for?

If the patent had disclosed that the product was itself toxic to insects or fungi, the case would have been different. However, there is no such disclosure. What the specification says is that the products of the process are valuable for *the preparation of* toxic substances such as insecticides, fungicides, etc.

This is an even more meager disclosure than that of the Nelson application. It means at most that the product can be used as one ingredient of or one "intermediate" for producing a toxic substance which in turn may be used to kill insects or destroy fungi, no clue being given as to which of the millions of species of insects and fungi will be affected by it. There is nothing whatever to show what is to be done with the product or with what other chemical substances it is to be reacted in order to produce toxicity. If the meaning of "preparation" be restricted to mechanical mixing with some other substance, as appellant argues, then the disclosure is no better because it is not stated whether the compound claimed is the poison or the carrier and, from the disclosure that it is a solvent, one might suspect that its use would be as a solvent in which to dissolve some insect poison.

In view of the explicit and stringent requirements of Section 112 and of the necessity that an applicant comply with them, the court should not rewrite the application on any surmise as to what the applicant meant but did not say. In Example IV he disclosed toxic products, none of which were the product claimed in the present application.

The substance of the majority opinion is contained in the following sentence: "It is sufficient if the product is disclosed as having toxic properties and if one skilled in this art is informed, as was done here, that the product is useful as an insecticide and fungicide." The point at which I am unable to agree is that I think that this product is not disclosed as having any toxic properties, either in the general statement of its properties or in the examples. (Example IV having been eliminated.) Of course, the requirement of 112 is a disclosure which will enable "any person skilled in the art to which it pertains to * * * use the same" and it is unnecessary to set forth minutiae of description or procedures perfectly obvious to professionals but unfamiliar to amateurs. However, compliance with Section 112 should

not present any great difficulties to an inventor who knows what his invention can be used for and how it promotes the useful arts. I do not think that, when the inventor has said one thing the court is entitled to speculate that one skilled in the art would know that he meant something else; that when he says his invention can be used to *prepare* a toxic substance he meant that it *is* a toxic substance. To say that flour is useful in the preparation of bread is simply not the same thing as saying that flour is bread.

I would affirm the decision of the board.