**Application of George H. HITCHINGS, Gertrude B. Elion and Irving Goodman.**

**Patent Appeal No. 7221.**

United States Court of Customs and Patent Appeals.
March 11, 1965.
Rehearing Denied May 6, 1965.

of 1955, appellants filed a Canadian patent application containing a disclosure nearly identical to that of the parent application. The Canadian application subsequently matured into Canadian Patent No. 560,171 (hereinafter "Canadian patent"), which issued July 8, 1958. The parent application did not fare so well. In June of 1957 the examiner finally rejected all of its claims "as being based upon a fatally defective disclosure of utility." Appellants filed an appeal with the board and submitted a brief, but the appeal was subsequently withdrawn and the application abandoned.

However, on March 1, 1960, several days before the parent application became abandoned, appellants filed another United States application [2] (hereinafter "instant" application), as a continuation-in-part of the parent application. The present appeal is from a board decision sustaining the examiner's final rejection of claims 3 and 4 of the instant application.

There are two separate grounds of rejection. First, the examiner rejected the claims of the instant application as "fully met" by the Canadian patent, which issued more than one year prior to the actual filing date of the instant application. Appellants did not dispute the disclosure of the Canadian patent, but sought to dispel the statutory bar it created under 35 U.S.C. § 102(b) by establishing as their effective date the filing date of the parent application, pursuant to 35 U.S.C. § 120. The examiner, however, held there was no continuity between the parent and instant applications, since the former had been found wanting in its disclosure of utility, and thus concluded that appellants were not entitled to the earlier filing date, citing Ex parte Buc, 114 USPQ 552 (P.O.B.A. 1957). The examiner also held that appellants could not re-contest the validity of the unappealed rejection of the parent application, since that rejection was said to be res judicata.

James M. Mason, New Haven, Conn., David Paul Weaver, Washington, D. C., for appellants.

Clarence W. Moore, Washington, D. C. (Raymond E. Martin, Washington, D. C., of counsel), for Com'r. of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

SMITH, Judge.

On October 7, 1955, appellants filed in the United States Patent Office an application [1] (hereinafter "parent") disclosing and claiming certain organic compounds and a process for making them. Shortly thereafter, in November

---

1. Serial No. 539,271, entitled "6–Oxyorganopurines and Method of Preparing Them."

2. Serial No. 11,967, entitled "6–Oxyorganopurines and Method of Preparing Them."

The second ground of rejection is directly concerned with the merits of the instant application itself. The examiner refused to allow the appealed claims on the ground that the specification fails "to teach how the invention is to be used," as required by 35 U.S.C. § 112.

This appeal thus presents the following three basic questions: 1) May appellants *now* be heard to argue that the final rejection of the claims in the parent case was improper, and that, as a matter of law, the parent specification did contain sufficient supporting disclosure of utility? 2) If so, *was* the disclosure of utility in the parent application sufficient? 3) If so, does the *instant* application contain the required teaching of how to use the claimed invention?

The Patent Office has answered all of these questions in the negative, and in order for appellants to prevail, all must be answered in the affirmative. Since the pertinence of each of the latter two questions depends upon the answer to those preceding it, we shall consider them in the order stated above.

### I. *Res Judicata*

■ On several occasions recently, this court has had to consider the doctrine of res judicata in various contexts. See, e. g., Switzer v. Sockman, 333 F.2d 935, 52 CCPA 759; In re Szwarc, 319 F.2d 277, 50 CCPA 1571; In re Fried, 312 F.2d 930, 50 CCPA 954. In those cases we have examined many of the fundamental problems encountered in applying res judicata. In this case, however, we need not concern ourselves with such problems, for we are convinced that principles of res judicata should not apply where the initial decision is no more than an unappealed final rejection of an examiner.

In Overland Motor Co. v. Packard Motor Co., 274 U.S. 417, 47 S.Ct. 672, 71 L.Ed. 1131 (1927), the Supreme Court held that an unappealed final rejection of a claim is not *necessarily* res judicata with respect to the question of patentability of a similar claim to the same invention contained in a divisional application filed after the initial rejection. The Court indicated that the decision to treat such a rejection as res judicata was optional, and rested with the Patent Office. And since the divisional application had matured into a patent, the Office was considered to have waived the option.

In so holding, the Court referred to In re Barratt's Appeal, 14 App.D.C. 255 (1899), in which the Court of Appeals for the District of Columbia had reached a similar conclusion. In Barratt, the Court pointed out that

"While the rules that govern the finality and conclusiveness of adjudications at the common law do not apply, in the strict sense, to administrative or quasi-judicial action in the Executive Departments of Government, yet in administrative action, as well as in judicial proceeding, it is both expedient and necessary that there should be an end of controversy. * * *

* * * * * *

"In what we have said we do not desire it to be understood that the Patent Office may not, if it thinks proper so to do, entertain and adjudicate a second application for a patent after the first application has been rejected. What we decide is, that it is not incumbent upon the office as a duty to entertain such applications * * *."

As was recognized by the Barratt court in 1899, and as is clear today, the inexorable and universal applicability of the traditional doctrine of res judicata to judicial proceedings does not always hold for administrative proceedings. Indeed, Professor Davis has said that the "central problem of res judicata in administrative law is to discover when or to what extent the traditional doctrine as developed in the judicial system should be applicable to administrative action." [3] We have considered the problem

---

3. Davis, Administrative Law 565 (1951). Pages 563–613 contain an excellent discussion of res judicata in the administrative setting.

in light of the guideline suggested by Davis and have concluded that a final rejection which has not been prosecuted to a final determination on appeal before the Patent Office Board of Appeals or a court should not be considered res judicata.

Of the factors which we have considered in arriving at this conclusion, one of the most significant has been the amazing diversity of opinion within the Patent Office itself. This circumstance would seem to indicate that there has been an utter lack of a uniform Patent Office policy with respect to the problem of res judicata.

For example, in Ex parte Buc, supra, the board had before it a fact situation nearly on all fours with the present case. The holding was that an examiner's final rejection would be considered res judicata. In so deciding, the board relied upon Lavin v. Pierotti, 129 F.2d 883, 29 CCPA 1235, and Whittier v. Borchardt, 154 F.2d 522, 33 CCPA 1023. Both of those cases involved interference proceedings and in both this court held that an examiner's final rejection was an act "judicial in character" and therefore should be considered res judicata.

However, in an opinion dated later than the Lavin case but earlier than the Whittier case, the board took a contrary position. Thus, in Ex parte Davidson, 58 USPQ 343 (P.O.B.A.1943), the board stated:

"The examiner has also rejected the claims on the ground of res adjudicata. * * *

"Appellant argues that he should not be refused the claims on appeal because of his failure to appeal from the final rejection in his earlier application. He points out that the course followed by applicant in this case is that recommended by Wolcott in the Manual of Patent Office Procedure which provided that in the case of continuation where an application has been prosecuted to a final rejection, an applicant may have recourse to filing a continuation in order to introduce into the case a new set of claims and to establish a right to further examination by the Primary Examiner. Appellant points out that the continuation application was filed before the time for appeal had expired for the purpose of putting the description and claims in accurate form. He cites a number of decisions, some by this Board, in which rejection on the ground of res adjudicata in similar circumstances has not been affirmed.

"It is considered unnecessary to discuss these decisions as it is apparent from the reference to the Manual of Patent Office Procedure that applicant's procedure is tolerated and this ground of rejection will not be affirmed."

The Davidson case was later cited with approval by the board, even in the interim between the Lavin and Whittier cases and the Buc case. See Ex parte Smith, 88 USPQ 121 (P.O.B.A.1950); Ex parte Turinsky, 100 USPQ 443 (P.O.B.A.1953).

In 1961, four years after the Buc decision, the board decided Ex parte Pfleger, 131 USPQ 439. In that case, certain claims of the appealed application were identical with claims which had appeared in a previous application and which had been finally rejected. Since no appeal had been taken from the earlier rejection, the examiner held the earlier rejection to be res judicata with respect to the claims in the later application, relying on the Lavin and Whittier cases. In reversing, the board said:

"We have considered the decisions referred to by the examiner, but are not convinced as to the applicability of the interparties situations there presented to the establishment of a precedent for the present ex parte action. It rather appears to be the policy of the Office to hold res judicata applicable as a ground of rejection where the same or substantially the same grounds of refusal *has been adjudicated by an appellate tribunal* such as the Board of Appeals or the Court of Customs and Patent Appeals. Such practice is

evidenced by Section 706.03(w) of the Manual of Patent Examining Procedure. We see no justification or precedent for the holding of res judicata against claims 1 and 2 stated by the examiner in this case, and the rejection on this ground is reversed." [Emphasis added.]

Section 706.03(w) of the Manual is set forth in the margin along with section 201.11.[4]

One year subsequent to the Pfleger decision, in 1962, the board decided Ex parte Armstrong, 139 USPQ 211. In Armstrong, the board held an unappealed final rejection to be res judicata, relying on Lavin, Whittier and Buc. The Pfleger case and section 706.03(w) of the Manual were not mentioned.

Thus, if reported board decisions are a valid indicator, the Patent Office appears to be applying the doctrine of res judicata to unappealed final rejections on a hit-or-miss basis, and if there is any Patent Office "policy" in this regard, it is a widely fluctuating one. It was precisely this "on again-off again" treatment of the problem that we condemned in In re Fried, supra.

In Fried, we held that an unappealed final rejection was not res judicata with respect to *different* claims in a later application. It was not necessary, therefore, for us to make an express holding with respect to the present problem. We did, however, indicate our dissatisfaction with the inconsistent way in which the problem is being handled by the Office, stating:

"We here observe that the express provisions of MPEP set forth an established Patent Office policy on which applicants for patents are entitled to rely in good faith in the orderly conduct of their business in the Patent Office. To depart from such policy as has been done here would, it seems to us, lead to such uncertainty on the part of applicants that they must necessarily traverse every ground of the examiner's rejection at each stage of the prosecution and appeal his adverse rulings lest the failure to do so returns in the guise of a binding *res judicata* which forfeits an applicant's privilege of foregoing his right of appeal and making the permissible corrective changes by filing a continuation application. In addition, it seems to us that such an uncertainty in procedure leaves the patent examiner vulnerable to a charge of arbitrariness, bad faith and favoritism when he, as the representative of the Patent Office, exercises the *res judicata* 'option' in one way in one case and in another way in a different case."

We also "expressly overruled" the Lavin and Whittier cases, to the extent they were inconsistent with our holding in Fried.

It is interesting to note that Fried was decided subsequent not only to the board's decision in the Armstrong case,

4. MPEP § 706.03(w) provides:
 "A prior adjudication against the inventor on the same or similar claims constitutes a proper ground of rejection as *res judicata*. Where a different question of patentability is presented the rejection of *res judicata* does not apply.
 "The rejection should only be used when the earlier decision was a final, appellate one, such as a Board of Appeals decision where the time limit for further remedies has expired, or a decision by the Court of Customs and Patent Appeals. But see 201.11, last

paragraph, for a special situation. * * *"
MPEP § 201.11 (last paragraph) provides:
 "Where the first application is found to be fatally defective because of insufficient disclosure to support allowable claims, a second application filed as a "continuation-in-part" of the first application to supply the deficiency is not entitled to the benefit of the filing date of the first application. * * * [Citing, e. g., the Buc case.] These cases also involve the question of res judicata."

supra, but also to the board's opinion in the case at bar. It is understandable then that the board did not feel, in either case, that any of our decisions compelled a contrary result. What is not so understandable, however, is the fact that both parties in the case at bar completely omitted reference to the Fried case in their briefs. For we think Fried clearly indicates the adverse feeling on the part of this court with respect to res judicata rejections predicated upon unappealed decisions of an examiner.

 Application of res judicata to unappealed final rejections seems to us a particularly inappropriate means for achieving the normal goals of the res judicata doctrine, i. e., reliability and finality of judgments, and conservation of judicial time and energy. In situations like the one presently before us, there is no party having a substantial interest in being able to rely on a conclusive judgment with respect to a particular issue. Certainly the Patent Office cannot claim such an interest. Indeed, Patent Office practice abounds with procedures which afford applicant every opportunity to secure the full protection to which he is lawfully entitled. Often, the filing of a continuation or a continuation-in-part results in a fresh approach to and an effective reconsideration of the same issues. In many ways, application of res judicata is at variance with the entire concept of continuing applications.

With regard to the goal of conserving the time of administrative and judicial tribunals, res judicata rejections would seem to have exactly the opposite effect. For if unappealed final rejections are uniformly held to be res judicata, the applicant has no choice other than appeal or abandonment of his case. But if time and energy are to be expended, even unnecessarily, it is much more desirable that such expenditure should occur at administrative levels. On balance, we believe that an applicant should be encouraged in, rather than penalized for, promptly filing a better application after final rejection instead of appealing, especially where so much of the procedural machinery of the Patent Office is designed to permit just such a remedy.

In short, we feel that the Patent Office has misapprehended the spirit of the Supreme Court's reasoning in the Overland Motor case.[5] It is inconceivable to us that the Court intended the Patent Office to apply res judicata when and where it chooses, with no uniform policy. Instead of increasing reliability and predictability, such a practice introduces a vast uncertainty on the part of the applicant, who does not know whether to appeal and fight his case to the "bitter end," or to file a new application and gamble that the examiner will not reject on the basis of res judicata. On the whole, we believe it much more desirable that applicants should know that they will *not* receive a res judicata rejection on the basis of an unappealed final rejection.

We therefore hold that the board committed error in refusing, on the ground of res judicata, to re-examine the disclosure of the parent application. To the extent that Lavin v. Pierotti and Whittier v. Borchardt are inconsistent with this decision, they no longer represent the law.

II. *The Parent Application*

 Appealed claims 3 and 4 of the instant application are drawn to "6-Acetonylmercaptopurine" and "2-Amino-6-

5. "We note that Overland involved an infringement situation, wherein the defendant sought to claim the benefits of res judicata for itself. The Court held that the option lay with the Patent Office, and since the Patent Office had not chosen to apply the doctrine, it was of no avail to the defendant. This would seem to indicate that the Court felt that res judicata is unavailable as to a stranger to the original proceedings, which involved only the applicant and the Office.

"It is also interesting to note that the Barratt case, upon which the Court in Overland relied, involved a situation wherein the second application lacked continuity with the first; there had been no co-pendency. In addition, an *appeal* had been taken to the same court on the *first* application."

acetonylmercaptopurine," respectively. There is no question but that the Canadian patent discloses both compounds. Thus, since the Canadian patent issued more than one year prior to the date on which the instant application was filed, appellants must be considered to have lost their right to a patent under the provisions of 35 U.S.C. § 102(b), unless they are able to antedate the Canadian patent. In order to establish an effective filing date prior to the Canadian patent, appellants must show that their earlier-filed parent application disclosed the invention of claims 3 and 4 "in the manner provided by the first paragraph of section 112," as required by 35 U.S.C. § 120.[6]

The parent application was finally rejected by the examiner as containing "a fatally defective disclosure of utility." It is the position of the Patent Office that such a rejection was sound and therefore appellants are not entitled to the filing date of the parent application.

While at first blush the language used by the examiner seems to indicate that the rejection of the parent application was based upon a want of utility under section 101, further reading of the examiner's action makes it clear that the rejection was also based upon a failure to comply with the "how to use" requirement of section 112. As the examiner went on to point out:

"* * * Neither of the two statements disclosed in the specification are sufficient to comply with the requirements of the patent statutes. The first statement "inhibitors of cell division, particularly with regard to temporary remissions of acute leukemia" is defective in the absence of clear and convincing proof that the composition is safe, effective and reliable for human

beings. No tests on humans have been submitted and said tests are necessary in cases of this nature. * * * Furthermore, there is a complete failure to teach *how* the invention is to be used, the proportions used, the *kind* of cell involved etc. It becomes obvious that the statement represents nothing more than an invitation to experiment. * * *"

The thrust of the first portion of this passage is seemingly directed toward the question of section 101 utility, while the second portion is unquestionably concerned with the requirements of section 112.

The entire disclosure relating to utility is contained in the following two paragraphs from the parent application:

"6-mercaptopurine and thioguanine, described in U. S. patent 2,-697,709 and our copending application 375,819, are known to be useful inhibitors of cell division, particularly with regard to providing temporary remissions of acute leukemia.

"The main object of the present invention is to provide new and useful compositions which modify the reactions of the known mercaptopurines so as to extend their range of usefulness particularly in regard to the absence of toxic side effects. It has now been found that certain S-substituted derivatives have a greater therapeutic index, and, as a result, an extended range of usefulness. The compounds are likewise useful in the inhibition of lactic acid bacteria and for their bacteriostatic action."

With regard to the question of section 101 utility, we think the above statement satisfies the requirements of the statute

6. The first paragraph of section 112 provides:
"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any

person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

as it has been interpreted by this court. In In re Krimmel, 292 F.2d 948, 48 CCPA 1116, we held that it was unnecessary to prove safety, effectiveness and reliability in the treatment of human beings, where the specification made no express mention of human utility and where the applicant's immediate aim appeared to be the treatment of animals. See also In re Bergel, 292 F.2d 955, 48 CCPA 1102; In re Dodson, 292 F.2d 943, 48 CCPA 1125. In the case at bar, the parent application likewise makes no mention of utility with respect to humans. And while the examiner might have been justified in calling for proof that the claimed compounds were effective in treating *animals*, see In re Novak, 306 F.2d 924, 49 CCPA 1283, we note that no such demand was made. The examiner merely called for "clear and convincing proof that the composition is safe, effective and reliable for human beings." Thus, since there was no challenge of the effectiveness of the claimed substances in the treatment of non-human subjects, we hold that the rejection of the patent application for failure to satisfy section 101 was erroneous.

With regard to the question of the "how to use" requirement of section 112, we note that the parent application contains no information whatever concerning methods or manner of administration, dosages, etc. In short, there is a complete absence of *express* disclosure of how to use the claimed compounds. Such a lack, however, does not per se render the disclosure inadequate under section 112. All the statute requires is that the disclosure be one which will "enable any person skilled in the art to which it pertains, or with which it is most nearly connected," to make and use the invention. Thus, where the manner of using a claimed compound is obvious to one of ordinary skill in the particular art, even though the specification is utterly barren of any express teaching of how to use, this court has found compliance with sec-

tion 112. In re Johnson, 282 F.2d 370, 48 CCPA 733.

The record before us contains the affidavit of one C. Chester Stock, dated October 16, 1957. Dr. Stock was, at the time of the affidavit, Chief of the Chemotherapy Division of the Sloan-Kettering Institute for Cancer Research. The affidavit was apparently filed in connection with and during the prosecution of yet another patent application [7] in the name of two of the present appellants. Attached to the affidavit is an article by Dr. Stock entitled "Studies in Experimental Cancer Chemotherapy," reprinted from "Current Research in Cancer Chemotherapy" (Report No. 3–55, August 1955) and issued by The Committee on Cancer Chemotherapy of the National Advisory Cancer Council. The body of the affidavit itself presents comparative test data resulting from clinical testing of 6-chloropurine and 2, 6, 8-tri-chloropurine for effectiveness against "mouse sarcoma 180." At one point the affidavit states that "The tests presented above were conducted in the manner described by the attached reprint."

The article by Dr. Stock sets forth in detail test procedures employed and results obtained during the screening of a number of compounds for chemotherapeutic effect on non-human cancers. Among the compounds tested was 6-mercaptopurine, one of the substances mentioned in the portion of the parent specification quoted above. 6-mercaptopurine is the subject of several of the claims of U. S. Patent No. 2,697,709, which patent was also mentioned in the parent application.

The Stock article contains much information concerning the method of using the compounds being screened. Thus, under the heading "Test Materials," Stock states:

" * * * Absorption can be obtained from intraperitoneally injected suspensions of some insoluble compounds sufficient to exert anti-tumor action. Subsequently better

7. Serial No. 557,249, filed January 4, 1956, entitled 6–Chloroparine. Now Patent No. 2,832,781.

vehicles and routes of administration may be sought. Formerly we have used butyl succinate, propylene glycol, or peanut oil for saline insoluble compounds. Gum acacia suspensions were used where the compounds were not soluble in the above. Now, all compounds are tried in a limited volume of saline and, if the material appears soluble, physiological saline is added to the desired volume. If in the limited volume of saline any preparation appears unlikely to dissolve, a concentrated preparation of carboxymethyl cellulose (CMC) * * * is added in place of additional saline to prepare a suspension of the compound in 0.5% CMC in saline. * * * Solutions in saline and suspensions in CMC are made up in 50 cc. volume containing the weight of compound to be given per kilo per day. Thus a dose of 5 mg./Kg./day would be given by daily injections into a 20 gm. mouse of one cc. of a solution of 5 mg. in 50 cc. It has been convenient to use volume rather than weight measurements of those compounds that are liquids at room temperature. The preparations of the compounds have been kept in the ice box in sterile bottles with rubber stoppers permitting access of the syringes. Compounds that may react with water or CMC or are otherwise unstable are made up fresh daily. Some have been used in peanut oil."

Further, under the heading "Techniques," in connection with Sarcoma 180 screening, Stock says:

"The intraperitoneal route has been selected for the screening program as the most convenient one that would give a good absorption of the compound. However, certain compounds may not show up to best advantage by this route. This was found true with cortisone against the lymphosarcoma (7) (Table 2). Others have employed the oral route of administration (25). One route of administration that is generally considered unsatisfactory is the intratumoral. Such injections are not consistent with the implied conditions of usefulness of chemotherapeutic agents, i. e., treatment of tumors not susceptible of local radiation or surgical removal. Another unrealistic technique has involved injection of compounds prior to tumor implantation. While this is objectionable in a screening procedure, it is conceivable that such an injection program might be required in certain antimetabolite studies or that the animals should be on a metabolite-free or-low diet prior to tumor implantation and antimetabolite injection."

Two of the steps in the method used by Stock for Sarcoma 180 screening were as follows:

"(3) Twenty-four hours later [after tumor implantation], start interperitoneal injections of the compound solution or suspension at 125 mg/Kg/day (unless the compound is known or suspected to be too toxic for that dose).

"(4) Continue injections twice a day for seven days."

We think these and similar passages from the Stock article indicate that there are certain standard methods of using compounds which have suspected chemotherapeutic activity against various forms of cancer in animals, and that such methods are within the knowledge of those skilled in the art. Certainly the article, dated prior to the filing date of the parent application, shows that those skilled in the art knew how to use 6-mercaptopurine, a compound very similar to those claimed in both the parent and instant applications.[8] In In re Adams,

8. We might also point out that Patent No. 2,697,709, referred to above, which claims 6-mercaptopurine, contains no express disclosures of how to use the compound.

The specification merely states that the main object of the invention is to "provide new compositions of matter which are useful as inhibitors of microorgan-

316 F.2d 476, 50 CCPA 1185, we held that where a claimed compound was similar to other known compounds, it would be apparent to one skilled in the art that the claimed compound could be used in the same manner as the known compounds, and thus that the requirements of section 112 were fulfilled.

We think the reasoning of the Adams case applies with equal force here. We therefore hold that the examiner was wrong in rejecting the parent application for failure to disclose how the claimed compounds were to be used. Having so held, it follows that appellants are entitled to the filing date of their parent application under section 120 and therefore, that the Canadian patent does not constitute a statutory bar. Accordingly, the first appealed ground of rejection is *reversed.*

### III. *The Instant Application*

■ There remains the second ground of rejection. As stated by the examiner in his answer:

"All of the claims stand finally rejected since there is a failure to teach how the invention is to be used. 35 USC 112. Even if it be assumed, arguendo, that one would know how to use the claimed compounds in treating *leukemia,* a form of *cancer,* no evidence has been submitted to substantiate this. * *"

There is no doubt, especially in view of his citation of the statute, that the examiner was at this point concerned with section 112. Later in his answer, however, he made reference to the allegations of utility contained in the specification and made comments which indicate that he also felt the claimed compounds had not been shown to possess the utility required by section 101.

isms and in providing temporary remission in the treatment of acute leukemia and chronic myelogenous leukemia." The fact that this disclosure was deemed sufficient by the Patent Office to satisfy the

The instant application contains the following statements regarding utility:

"6-mercaptopurine and thioguanine described in U. S. Patents 2,697,-709 and 2,884,667 are known to be useful inhibitors of cell division, particularly with regard to providing temporary remissions of acute leukemia.

"The main object of the present invention is to provide a novel group of compounds which more effectively inhibit unnatural cell division and multiplication in general and with particular respect, for example, to chronic myelocytic leukemia. Pharmacologically, the compounds have been shown effective in transplanted animal tumors. The present derivatives appear to modify and extend the effective range of the known mercaptopurines through the absence of toxic side effects, whereby a greater therapeutic index is obtained. The compounds are also bacteriostatic and inhibit lactic acid bacteria."

With regard to these statements, the examiner commented:

" * * * Hence, there are two aspects to the utility statement. The first relates to the inhibition of 'unnatural cell division' and the second to inhibiting lactic acid bacteria and as a bacteriostatic.

"As to the first utility the Examiner's position is that the submitted evidence is *insufficient* to show that the compounds can in effect inhibit 'unnatural cell division.'

"With regard to the second portion of the utility statement, it is equally defective. * * *"

The board in substance agreed, pointing out that:

"We agree with the Examiner that the application does not disclose how

requirements of section 112 argues strongly for the proposition that those skilled in the art would, without more, know how to use 6-mercaptopurine.

the claimed compounds are to be used and that, with respect to the inhibiting function which appellants particularly associate with chronic myelocytic leukemia, the record does not contain adequate evidence that the claimed compounds so inhibit."

Concerning the "how to use" issue, we have already indicated, in our discussion of the parent application, that one of ordinary skill in the art would know how to use the claimed compounds. We therefore hold that the rejection of the claims in the instant application for failure to comply with section 112 was erroneous.

It is evident, however, that both the examiner and the board were of the opinion that appellants had not shown, to the satisfaction of one skilled in the art, that the claimed compounds were effective for any of the alleged utilities. The solicitor and appellants have devoted large portions of their briefs to this question.

Essentially, the issue turns on whether appellants have proved the truth of the statement in their instant specification that "the compounds have been shown effective in transplanted animal tumors."

Appellants rely upon two affidavits of Dr. Samuel Bieber, the Senior Research Biologist in charge of the cancer chemotherapy screening program at The Wellcome Research Laboratories at Tuckahoe, New York. The first affidavit contains a brief description and results of experiments conducted under his direction as a part of the screening program. Mice having artificially implanted tumors were treated with the claimed compounds, by intraperitoneal injection and, in two instances, by oral administration. After three weeks and several treatments, the mice were killed and the tumors dissected out and weighed. Dr. Bieber set forth the results in the table which is reproduced below:

| Compound | Dose mg./kg. | TWI | T/N | Toxicity | BWI |
|---|---|---|---|---|---|
| 6–Acetonylthio-purine (cl. 3) | 100 i.p. | 0.43 | 4/6 | 0/6 | 1.03 |
| | 250 i.p. | 0.005 | 2/6 | 0/6 | 0.97 |
| 2–Amino–6–aceton-ylthiopurine (cl. 4) | 25 i.p. | 0.06 | 10/12 | 0/12 | 1.1 |
| | 75 i.p. | 0.07 | 4/4 | 2/6 | 0.97 |
| | 100 p.o. | 0.02 | 5/6 | 0/6 | 0.76 |
| | 250 p.o. | 0.63 | 4/5 | 1/6 | 0.76 |

In the table, TWI refers to Tumor Weight Index and represents the ratio of average tumor weight in treated mice to average tumor weight in control mice. BWI stands for Body Weight Index and represents a similar ratio using average body weight. T/N represents the number of tumors remaining compared with the number of animals surviving the treatment. Thus, for example, six tumor-ridden mice were given intraperitoneal injections of the compound of claim 3 in doses of 250 mg. per kg. of body weight. All six survived the treatment and the tumors were completely eliminated in four of them. The ratio of the average

tumor weight of the treated mice to the average tumor weight of controls was 0.005, and the body weight ratio was 0.97. Similarly, twelve mice were given 25 mg. per kg. injections of the compound of claim 4. Of these, all survived the treatment and two experienced complete elimination of the tumors. The tumor weight ratio was 0.63 and the body weight ratio was 1.1.

Bieber's second affidavit is essentially supplementary to the first, and contains his statement that the above results "are mathematically and statistically significant and prove beyond any reasonable doubt the anti-tumor activities of the

compounds which are the subject of the application."

The board held, and the solicitor argues, that the affidavits are insufficient because they "do not establish the control basis of the experiments." However, appellants assert, and we agree, that it is apparent that control groups were used. We cannot imagine how ratios such as the Tumor Weight Index and the Body Weight Index could be established without average tumor and body weight data for a group of control animals. Moreover, the solicitor's speculations concerning possible differences in age, condition, treatment, etc. between the controls and the treated mice, and the possible effect such differences (if they existed) might have on the validity of the test data, are not persuasive. Experimenters cannot be reasonably expected to anticipate every possible objection which might be raised regarding the accuracy of their tests. For example, the solicitor argues:

"The use of old mice as controls and young mice as experimental animals could have induced results unduly favorable to the inhibition of tumors in the experimental animals. Similarly, misleading results might have followed from differences in size or state of health as between the two groups of animals tested. Along the same line, the experimental data reported may be entirely consistent with an enriched diet for the experimental animals and a nutritionally deficient diet for the controls, or with the use of clean, well ventilated cages maintained at normal temperatures for the experimental animals and dirty, poorly ventilated cages maintained at uncomfortable temperatures for the controls. * * * "

It is obvious that a nearly endless list of such objections could be imagined. It would be intolerable to require an experimenter to account for all of them. On the contrary, since we feel that Dr. Bieber's expertise in this area is amply authenticated by the affidavits, we are of the opinion that his test data may safely be accepted as being of the type and quality which would satisfy others of similar skill in the art.

The board also objected to the affidavits on the basis that:

"* * * Neither the number nor the character of the suggested individual experiments is such as to establish the effectiveness 'in transplanted tumors' with any reasonable degree of certainty. * * * "

We disagree. As appellants point out, a total of 42 mice were treated with one or the other of the claimed compounds, and the results obtained with these animals were compared with groups of control mice. And in every case, the tumors were reduced in comparison with the controls.

Appellants further assert, and we believe correctly, that Dr. Bieber's test procedures and data compare favorably with those set forth in the Stock article discussed above. We take this as further evidence that the methods used by Dr. Bieber were of the type and quality which would be acceptable to those having ordinary skill in the art.

We therefore hold that the rejection of the claims in the instant application for lack of utility under section 101 was unwarranted. The appealed decision is accordingly reversed.

Reversed.

WORLEY, C. J., concurs in the result.