**Application of Henri MOUREU and Paul Chovin.**

**Patent Appeal No. 7247.**

United States Court of Customs and Patent Appeals.

May 20, 1965.

Smith, J., dissented.

Ellsworth H. Mosher, Washington, D. C. (Stevens, Davis, Miller & Mosher, Washington, D. C., of counsel), for appellants.

Clarence W. Moore, Washington, D. C. (Raymond E. Martin, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

ALMOND, Judge.

This is an appeal from the decision of the Board of Appeals affirming the rejection under 35 U.S.C. § 112 of all claims in appellants' application.[1]

The invention and its use are described by appellants in their application as follows:

"The compounds of the present invention are the 5:5'-dinitro-2:2'-dichlorohydrobenzoins conforming to the following planar formula:

zoin and Process for Preparation Thereof."

---

1. Serial No. 734,090, filed May 9, 1958 for "5,5'-Dinitro-2,2'-Dichloro-Hydroben-

which have been found to possess highly useful pharmacological properties which could not have been predicted from their chemical structure. In particular, they possess substantial anti-tubercular activity. They can also be employed in veterinary medicine against coccidioses, septicaemias of young animals, refractory purulent endometrites, mammary colibacillosis and brucellosis."

The two appealed claims [2] are:

"1. As a new composition of matter a compound having the planar formula:

"2. A 5,5'-dinitro-2,2'-dichlorohydrobenzoin in the form of a crystalline product having a melting point of 222 C. (Kofler block)."

The application contains no disclosure of the utility and methods of using the claimed compounds other than that set forth above. The examiner's sole ground of rejection was that there was an insufficient disclosure of how to use the claimed compounds under 35 U.S.C. § 112. The examiner's answer states:

"The utility of any medicinal composition obviously depends upon the dosage and the manner of administration to the subject, yet applicants have neither disclosed nor suggested what dosages would be safe or effective nor what the lethal dosages might be. Neither is the manner of administration of the medicine to the subject been disclosed or suggested, whether by application to the

skin, by inhalation, by ingestion or by injection into the body tissues. Neither would one skilled in the art be taught by knowledge of the medicinal use of a compound having an analogous chemical structure how to use the claimed products since applicants disclose that:

" 'The compounds of the present invention—have been found to possess highly useful pharmacological properties *which could not have been predicted from their chemical structure.*' (Emphasis examiner's.)

It is therefore clear that those skilled in the art who desire to use the products of the invention for medicinal purposes would find it necessary to engage in extensive experimentation to determine what would be the effective and safe manner of using the products as medicines for the suggested purposes and to determine the dosages to be avoided because lethal or ineffective."

Both the examiner and the board recognized that compliance with section 112 does not necessarily require specific recitations of use if the method of using is inherent in the description of the compound, In re Nelson, 280 F.2d 172, 47 CCPA 1031. The board held, however, that a bald assertion that the claimed compounds possess antitubercular activity would not indicate to those skilled in the medical arts the manner of effectively using the compounds.

 In their brief, appellants argue that a skilled medical practitioner would know how to use their compounds.[3] They rely upon In re Nelson, supra; In re Johnson, 282 F.2d 370, 48 CCPA 733; In re Adams, 50 CCPA 1185, 316 F.2d 476, and In re Hartop, 50 CCPA 780, 311 F.2d 249.

2. Appellants, in their brief, withdrew the appeal to process claims 3 to 7.

3. Appellants also argue that their compounds have *in vitro* utility and that it would be apparent how to achieve this

utility. This argument was not raised below. Since we do not have the views of the examiner and board, we cannot properly consider it here, In re Griner, 48 CCPA 852, 287 F.2d 178.

In Nelson certain intermediate steroid compounds were claimed. The application did disclose that other steroids could be made from these intermediates by chemical reactions. Although the reactions (hydrolysis, hydrogenation and oxidation) were not completely described, they were mentioned. Thus there was a "how to use" disclosure and it was found to be sufficient. There is no "how to use" disclosure in the present case.

In Johnson the facts were similar to those here. A compound was claimed and its utility as a fungicide or insecticide was disclosed, but there was no "how to use" disclosure. Standard chemical and scientific treatises, however, indicated that insecticides or fungicides were effective in a wide variety of forms and percentages. Applying the same approach to the present case, it is noted that a standard pharmacology text[4] indicates that commonly used antitubercular drugs should be administered in a very specific manner. Furthermore, the method of administration varies with each drug. Dosages may vary from 1 gram twice weekly for streptomycin to 12 grams a day for para-amino-salicylic acid. Some of the drugs may be administered orally, some intramuscularly, others intravenously, and a few by all of these methods. The problem of determining the method of using an antitubercular drug is so much more complex than that of using a fungicide that we cannot say that the method of use was apparent as in the Johnson case.

In Adams we held that because the claimed compound was similar to other known compounds, it would be apparent that the claimed compound could be used in the same manner as the known compounds. Here, however, the claimed compounds are apparently not similar to any known compounds. Appellants have stated that their "pharmacological properties * * * could not have been predicted from their chemical structure."

The Hartop case considered the degree of *safety* which must be shown to satisfy the utility requirement of 35 U.S.C. § 101. The safety issue is not before us and we think that Hartop is therefore inapposite.

■■ It can thus be seen that none of the cases cited by appellants support their position that no "how to use" disclosure is necessary under the particular facts here present. Indeed, appellants' attorney, at oral argument, stated that this is a case of first impression as far as he was aware and that the court would have to go further than it had ever gone before to reverse the board. We are not inclined to go that far. Appellants have not placed one iota of evidence in the record to indicate that one skilled in the art would be able to use their antitubercular compounds effectively without undue experimentation. Thus, we have no way of knowing whether an express "how to use" disclosure is necessary. The Patent Office says that it is. To reverse the Patent Office on the record in this case would in effect be to hold that a patent application need not indicate "how to use" a claimed chemical compound. We are bound by the first paragraph of 35 U.S.C. § 112 which requires such a disclosure.

In exchange for patent protection, a full disclosure is required. "Promotion of the useful arts takes place through the combination of * * * two factors, the doing of the work *and the disclosure of the results* thereof." In re Nelson, 47 CCPA at 1046, 280 F.2d at 182, 126 USPQ at 251. It is not clear how appellants determined that their compounds have antitubercular activity unless their work involved *use* of the compounds against tuberculosis. Appellants must either so describe the method of use as to enable one skilled in the art to use the compounds or show that one skilled in the art would know how to use them,

---

4. Goodman and Gilman, The Pharmacological Basis of Therapeutics (2d ed. 1955). We take judicial notice of this text at the solicitor's request, In re Norris, 37 CCPA 876, 179 F.2d 970, 84 USPQ 458.

In re Nelson. Appellants have done neither.

The decision of the board is therefore affirmed.

Affirmed.

RICH, Judge (concurring).

I agree with the majority because it seems to me that either appellants have not told everything they know about their invention, referring to Judge Smith's point, or their statement about what they know as to utility is unfounded.

Perhaps they could have made an acceptable case by stating what they did *not* know and standing on the proposition that their new compound finds its utility as something to *experiment* with in the field of anti-tubercular activity and veterinary medicine, any research worker knowing *how to* do that. In re Folkers & Shunk (decided May 6, 1965), 52 CCPA ——, 344 F.2d 970, 145 USPQ ——.

SMITH, Judge (dissenting).

My disagreement with the majority begins with a fundamental difference of opinion as to what the invention is which is covered by the appealed claims. Both claims are directed *to a new composition of matter* which is fully disclosed in the specification. Yet, because an aspect of the asserted utility of the product mentioned in the specification relates to the "highly useful pharmacological properties" of this composition, the majority, apparently because no method of administration, dosages, etc. are given in the specification, sanctions a double standard under section 112 for the disclosure of utility in such cases. A chemist very probably invented the claimed composition of matter, and knowing some of its properties he could, as was here done, suggest certain uses for it. What possible public benefit is served if such a person assumes the perogative of the trained physician and specifies dosages, methods of administration, etc.? Yet just such a speculative statement by one who may appear as the inventor apparently would be an acceptable statement of utility despite his total lack of professional qualifications to make it.

The basic problem posed by this appeal is an old one. Its resolution requires us to determine whether, despite the omission of such detailed information in the specification as how to use the disclosed composition, it contains enough to disclose the properties of the claimed compound to a person of ordinary skill in the art. While I agree with the majority that there is no record evidence to indicate that one skilled in the art would be able to use the claimed composition of matter as a pharmaceutical without further experimentation, it is my position that 35 U.S.C. § 112, upon which the appealed rejection is based, does not require such "evidence."

Thus, resolution of the issue here turns on the interpretation of the language of section 112 concerning the "how to use" requirement applicable to the claimed composition of matter when used in the pharmaceutical field. The majority finds that the disclosure is insufficient in that it does not include a disclosure of how to administer the compound as a pharmaceutical, the dosages, or its physiological effects. There is no question here of novelty or of unobviousness of the claimed compound. The sole question is how extensive a disclosure is required of an applicant under section 112.

The board's decision and the majority opinion clearly establish a double standard of disclosure under section 112. Thus if we attempt to apply the general principles of the majority opinion here to the invention of a hammer in the mechanical field, it would require the patent application for the hammer to describe its use, even to the extent of telling right and left handed users how to use it, i. e., grip the handle in the right hand if right-handed or in the left hand if left-handed. Likewise the various weights of hammers would have to be related to their proposed uses, i. e., do not use a light tack hammer to drive a spike or use a heavy maul to drive a finishing nail. Such an example illustrates the illogic in the majority position.

Another example of this same fallacy is seen if the logic of the majority opinion is applied to a chemical compound disclosed, for example, as a paint and varnish solvent. No question would arise as to the sufficiency of such a disclosure under 35 U.S.C. § 112. If, however, as has been found to be the case with such a compound as dimethyl sulf-oxide (DMSO), it is later found to possess some possible pharmaceutical properties, is the public interest served by refusing a patent on the composition because the compound also has pharmacological properties and dosages, etc. are not stated? In other words, it seems to me to be at variance with the underlying concept of the patent law to insist, as is here done by the majority, that 35 U.S.C. § 112 in its so-called "how to use" provisions requires a different standard of disclosure in the case of chemical compositions which may have pharmacological properties.

Such considerations show up what seems to me to be the basic fallacy in the majority opinion, i. e., confusing the invention *claimed* with the *uses* asserted for that invention. The claimed invention before us is a new chemical compound; in the language of the patent statute, a new composition of matter. Conceivably it may have various uses, one of which is a pharmacological use. The narrow construction which the Patent Office and the majority place on section 112 when related to such an invention seems to me to defeat the public purpose of the patent laws, i. e., to secure as rapidly as possible the disclosures of new inventions and the dissemination of known information concerning them.

I think the patent law, both in logic and in spirit, demands that the applicant disclose information relevant to the claimed invention. Thus, I see nothing inherently wrong in the type of disclosure before us which says in effect "It appears highly probable that our new chemical compound will be found useful as a pharmaceutical." It is entirely possible that such a compound may find other uses as well. While such a disclosure may well be an "invitation to experiment," is not one of the real benefits which the public receives from the issuance of patents?

The "invitation to experiment," here condemned by the Patent Office, is, I am convinced, one of the great public benefits of the patent system. No invention ever is complete or perfect. The history of science and technology is the history of slow and painful experimentation and development, with each forward step being based on previous knowledge. The patent system was conceived, it seems to me, to encourage such halting, experimental steps. To deny an applicant, despite the fact (or more accurately, here *because* of the fact) that he has disclosed everything he knows about his invention, seems manifestly unjust and in complete disharmony with the whole concept of our patent system.

I think we should resolve the issues here on the basis of the simple consideration of what the specification discloses to persons of ordinary skill in the art to which it pertains. To chemists, does it disclose the compound? To medical researchers, does the application teach enough of the properties of the claimed compound that those of ordinary skill in the medical sciences can reasonably be expected to know how to use it? I do not think we should dispose of this kind of a case on the basis of the judicial guesswork which underlies the majority opinion. Instead, I think we should take judicial notice of the fact that the fields of medicine and pharmacology are highly sophisticated areas which require a high level of intelligence and education on the part of those working in these areas. Accepting this fact, it does not seem to me that it would be beyond the expected skill of these working in these arts to place a drop of the claimed chemical compound on a culture of tuberculines and to note its effect. Similarly, it does not seem to me to be beyond the range of such skills to know, for example, that a crystalline material should be put into solution before intravenous or parenteral application is attempted. It seems to me

also that knowing the chemical structure and chemical characteristics of the claimed compound, as taught in the specification, one of ordinary skill in these fields should be expected to know how it can and should be administered.

It is my deeply-held conviction that we should take this opportunity to reject, once and for all, the anomalous interpretation of section 112 which holds that the *entire* phrase—"the manner and process of making and using"—applies to each statutory class of invention. How, for example, can one disclose satisfactorily the "process" of "making" *a process*? Rather, it seems to me, the interpretation of the language of section 112 should be one of reason. As we stated in In re Hitchings, 342 F.2d 80, 52 CCPA ——:

"* * * All the statute requires is that the disclosure be one which will 'enable any person skilled in the art to which it pertains, or with which it is most nearly connected,' to make and use the invention. Thus, where the manner of using a claimed compound is obvious to one of ordinary skill in the particular art, even though the specification is utterly barren of any express teaching of how to use, this court has found compliance with section 112. In re Johnson, 282 F.2d 370, 48 CCPA 733."

Clearly as to the claimed chemical compound appellants here have satisfied such a requirement. They have not claimed a method of treating a disease. Why therefore should they be required to prescribe dosages, methods of administration, etc. on the theory that their invention resides in the *use of* rather than in the compound itself?

I would reverse the decision below.